**Jose Napoleon MARQUEZ–ALMANZAR, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

Docket No. 03–4395(L), 03–40027(CON), 03–40497(CON).

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 2004.

Decided Aug. 8, 2005.

Peter Markowitz, The Bronx Defenders, Bronx, NY, for Petitioner.

Patricia Buchanan, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York; Megan L. Brackney and Meredith E. Kotler, Assistant United States Attorneys, on the brief), New York, NY, for Respondent.

Before: WALKER, Chief Judge, MINER and CABRANES, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

This case was transferred to our court by an order of the United States District Court for the Southern District of New

York (Gerard E. Lynch, *Judge*), which found, pursuant to 8 U.S.C. § 1252(b)(5), that the district court lacked jurisdiction over the nationality claim made in Jose Napoleon Marquez–Almanzar's § 2241 habeas corpus petition. As we explain below, resolution of the complex procedural and jurisdictional questions originally presented by the case is no longer necessary in light of the enactment, on May 11, 2005, of the REAL ID Act of 2005, Pub.L. No. 109–13, 119 Stat. 231. The REAL ID Act eliminates habeas corpus review of orders of removal and requires that any § 2241 petition pending in the district court at the time of its enactment be transferred to the court of appeals in which the petition could have been properly brought as a petition for review from a final order of removal under 8 U.S.C. § 1252. We thus construe Marquez–Almanzar's case as a petition for review from the January 31, 2003, order of the Board of Immigration Appeals ("BIA") and reach the merits of Marquez–Almanzar's claim without considering the district court's jurisdictional ruling.[1]

Marquez–Almanzar seeks to avoid removal by arguing that he can demonstrate that he owes "permanent allegiance" to the United States and thus qualify as a U.S. national under section 101(a)(22)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(22)(B). That provision defines "national of the United States" as "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." We hold that § 1101(a)(22)(B) itself does not provide a means by which an individual can become a U.S. national, and deny Marquez–Almanzar's petition accordingly.

## BACKGROUND

In April 1976, Marquez–Almanzar, a native of the Dominican Republic, was admitted to the United States as a lawful permanent resident. In November 1984, he voluntarily enlisted in the U.S. Army. Marquez–Almanzar served from 1985 to 1993, for three years as a regular and for five years as a reservist. While in the Army, he submitted an application for U.S. citizenship, but the application apparently was never processed.[2] Several years after finishing his military service, in May 1998, Marquez–Almanzar was convicted in New York state court of possessing and attempting to sell cocaine, for which he was sentenced to three concurrent terms of imprisonment, the longest of which was a term of seven years to life. In May 1999, the Immigration and Naturalization Service ("INS") served Marquez–Almanzar with a Notice to Appear, charging that he was subject to removal from the United States both because he was an alien who had been convicted of a controlled-substance offense, *see* 8 U.S.C. § 1227(a)(2)(B)(i), and because he was an alien who had been convicted of an "aggravated felony," as that term is defined in 8 U.S.C. § 1101(a)(43), *see* 8 U.S.C. § 1227(a)(2)(A)(iii). In December 1999, hearings commenced in immigration court, at which Marquez–Almanzar was repre-

---

**1.** We also have before us, consolidated with the transferred case, Marquez–Almanzar's petition for direct review of the BIA's January 31, 2003, order, which dismissed, for lack of jurisdiction, a motion Marquez–Almanzar filed with the BIA seeking termination of removal proceedings on the grounds that he is a U.S. national. Because we construe Marquez–Almanzar's transferred habeas petition as a petition for review from this same order, the two petitions effectively merge for purposes of our disposition of the case.

**2.** There is no record of this application having been filed or adjudicated. Marquez–Almanzar asserts that "due to a clerical error on the part of United States government personnel," the application was never processed, but offers no evidence supporting this claim.

sented by an Accredited Immigration Representative. In his defense, Marquez–Almanzar claimed that the convictions that provided the basis for his removal were still pending on direct appeal. On December 16, 1999, the immigration judge ("IJ") agreed to suspend removal proceedings in order to determine whether this claim was true.

While the proceedings were suspended, in January 2000, Marquez–Almanzar applied to the INS for naturalization, indicating on his application form that he qualified for citizenship based on his service in the U.S. Army. On June 19, 2000, when Marquez–Alamanzar's removal hearings resumed, the IJ determined that Marquez–Alamanzar's convictions were not pending on appeal. Marquez–Alamanzar then asked that removal proceedings be terminated pursuant to former 8 C.F.R. § 239.2(f) (2000),[3] stating that he had applied for naturalization and claiming that he could demonstrate prima facie eligibility for citizenship. The IJ held that Marquez–Almanzar was not prima facie eligible because his drug convictions precluded him from showing the "good moral character" required for naturalization, and, further, because there were no "unusual or compelling humanitarian reasons" to terminate the proceedings under 8 C.F.R. § 239.2(f). The IJ then ordered Marquez–Almanzar removed to the Dominican Republic.

On July 3, 2000, Marquez–Almanzar appealed the IJ's decision to the BIA, arguing that the IJ erred in finding him prima facie ineligible for naturalization. On July 7, 2000, the BIA rejected his appeal on the grounds that he had failed to attach proof of service. Marquez–Almanzar resubmitted his papers on July 27, 2000, only to have the BIA, on October 18, 2000, dismiss his appeal as untimely. He thereafter filed numerous motions for reconsideration, all of which were rejected on procedural grounds.

On December 20, 2001, Marquez–Almanzar filed a *pro se* habeas corpus petition in the United States District Court for the Southern District of New York, claiming for the first time that he was a national of the United States, not an alien, and thus could not be removed. The district court appointed counsel to represent Marquez–Almanzar, and, upon receiving a joint "Stipulation and Order of Settlement and Withdrawal" from Marquez–Almanzar and the government, allowed Marquez–Almanzar to withdraw his habeas petition without prejudice, vacated all of the BIA's previous orders, and remanded the case to the BIA for consideration on the merits of the claim of U.S. nationality raised in Marquez–Almanzar's habeas petition. *See Marquez v. INS*, No. 02 Civ. 311 (S.D.N.Y. Nov. 1, 2002).

Following the district court's order, Marquez–Almanzar submitted to the BIA a "motion to terminate" removal proceedings, arguing that his service in the Army, efforts to acquire U.S. citizenship, and other evidence, demonstrated that he "owed permanent allegiance" to the United States, and was thus a national of the United States as defined by 8 U.S.C. § 1101(a)(22)(B). On January 31, 2003, the BIA rejected Marquez–Almanzar's

---

**3.** The regulation, which was repealed in 2003, provided as follows:

> An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie

eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

submission, construing it as a motion to reopen, and finding that since its October 18, 2000, order had dismissed Marquez–Almanzar's appeal of the IJ's order of removal as untimely, jurisdiction over a motion to reopen still lay with the IJ. The BIA's order did not address the fact that the district court's remand order had purported to vacate the BIA's October 18, 2000, order, or otherwise refer to the district court's remand.

On February 21, 2003, Marquez–Almanzar petitioned our court for review of the BIA's January 31, 2003, order, characterizing it as a "final order of removal." Additionally, on March 9, 2003, Marquez–Almanzar filed a new habeas corpus petition in the district court pursuant to 28 U.S.C. § 2241, asserting that he could not be removed from the United States, because (1) he was a U.S. national and (2) the IJ had erroneously found that he was not prima facie eligible for naturalization as a U.S. citizen based on his aggravated felony conviction. On May 28, 2003, the district court held that, under 8 U.S.C. § 1252(b)(5), only the court of appeals could hear Marquez–Almanzar's nationality claim, and that the district court therefore did have not jurisdiction to entertain this claim as part of a § 2241 petition. The district court accordingly purported to "dismiss" Marquez–Almanzar's petition, and transferred it to our court under 28 U.S.C. § 1631. *See Marquez–Almanzar v. Ashcroft,* 2003 WL 21283418 (S.D.N.Y. June 3, 2003), 2003 U.S. Dist. LEXIS 9272, at *19–*20. Marquez–Almanzar appealed.

We subsequently consolidated: 1) the case as it was transferred to us by the district court; 2) Marquez–Almanzar's appeal from the district court's decision dismissing his § 2241 petition; and 3) Marquez–Almanzar's petition for review of the January 31, 2003, BIA order.

## DISCUSSION

### I. Nationality Claim

#### A. *Jurisdiction*

The district court transferred Marquez–Almanzar's § 2241 petition to our court on the theory that 8 U.S.C. § 1252(b)(5) [4] bars district courts from adjudicating in the first instance claims of U.S. nationality, when raised as a defense to removal. The court found that § 1252(b)(5) "on its face, appears to provide that nationality claims shall be presented to the Court of Appeals in the first instance, and transferred to the District Court only if the Court of Appeals determines that the petition involves genuine issues of material fact." *Marquez–Almanzar,* 2003 U.S. Dist. LEXIS 9272, at *7.

Marquez–Almanzar argues that the district court erred in light of the Supreme

---

4. The statute provides as follows:

 (5) Treatment of nationality claims

 (A) Court determination if no issue of fact.

 If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

 (B) Transfer if issue of fact

 If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.

 (C) Limitation on determination

 The petitioner may have such nationality claim decided only as provided in this paragraph.

Court's decision in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and our own decisions in *Liu v. INS*, 293 F.3d 36 (2d Cir.2002), and *Wang v. Ashcroft*, 320 F.3d 130 (2d Cir.2003). In his view, these cases establish that habeas corpus review remains available unless Congress has explicitly abrogated such review by referring to "habeas corpus" or " § 2241" in the statute said to eliminate it. Neither § 1252(b)(5), nor any other part of § 1252, contained such a reference at the time Marquez–Almanzar brought his habeas petition in the district court. The government argues, following the reasoning of the district court, that the clear-statement rule in *St. Cyr* applies only where abrogating habeas would leave a petitioner with no other means of review under the statutory scheme. Because § 1252(b)(5) provides for review of nationality claims in the court of appeals, the government contends, we should interpret the statute as foreclosing § 2241 review in the district court.

This question was of considerably greater significance when we heard argument than it is now, as we issue our decision. That is because on May 11, 2005, the REAL ID Act of 2005, Pub.L. No. 109–13, 119 Stat. 231, became law. Section 106(a)(1)(B) of the Act, 8 U.S.C. § 1252(a)(5),[5] unequivocally eliminates habeas corpus review of orders of removal, with a limited exception not relevant here.

Section 106(b) makes this provision effective immediately and applicable to cases, like Marquez–Almanzar's, "in which the final administrative order of removal, deportation, or exclusion was issued before, on, or after" the date of enactment. Section 106(c) requires that any case pending in district court on the date of enactment that was brought challenging an order of removal under the general habeas statute, 28 U.S.C. § 2241, be transferred to the court of appeals for the circuit "in which a petition for review could have been properly filed." The court of appeals is to "treat the transferred case as if it had been filed pursuant to a petition for review" under 8 U.S.C. § 1252, except that the thirty-day deadline ordinarily imposed on such petitions by 8 U.S.C. § 1252(b)(1) does not apply. REAL ID Act § 106(c).

Marquez–Almanzar's argument that § 1252 does not contain a clear statement abrogating § 2241 relief has thus been answered by the new provisions added to § 1252 by the REAL ID Act. Moreover, even if we were to determine that the district court, at the time of its decision, erred in transferring Marquez–Almanzar's habeas petition to our court, it would be pointless to remand this case to the district court, as the district court would be obliged by section 106(c) of the Act to transfer the case back to us for resolution on the merits.[6] We thus decline to decide

---

**5.** The amended statute provides as follows:

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision ... a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter .... For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms

"judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision ....

**6.** Because Marquez–Almanzar's removal proceedings were completed in New York, a petition for review would have been properly filed in our court. *See* 8 U.S.C. § 1252(b)(2) ("The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the [removal] proceedings.").

the primary jurisdictional question presented by this case, as our jurisdiction no longer depends upon its resolution, and as any answer in this regard would have little, if any, relevance to future litigation, given the REAL ID Act's elimination of § 2241 relief as a means to review orders of removal.[7]

Accordingly, we treat Marquez–Almanzar's transferred § 2241 petition as a petition for review filed under 8 U.S.C. § 1252(b) (5), and proceed to the merits. *Cf. Langhorne v. Ashcroft,* 377 F.3d 175, 177 (2d Cir.2004).

### B. *Merits*

 Marquez–Almanzar argues that he is not an alien and thus cannot be removed from the United States for his crimes. *See* 8 U.S.C. § 1227(a)(2)(B)(i) (any "alien" convicted of controlled substance offense after admission to United States is deportable); 8 U.S.C. § 1227(a)(2)(A)(iii) (any "alien" convicted of aggravated felony after admission to United States is deportable). The term "alien" is defined in this context as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). Marquez–Almanzar acknowledges that he is not a U.S. citizen, but he claims to be a national of the United States. The term "national of the United States" means either "a citizen of the United States" or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. §§ 1101(a) (22)(A) & (B).

Marquez–Almanzar claims that, although he is not a citizen, he "owes permanent allegiance to the United States," and thus has acquired U.S. nationality under 8 U.S.C. § 1101(a)(22)(B). The statute, as he reads it, creates an independent avenue to U.S. national status: one can become a U.S. national without citizenship (*i.e.,* a "non-citizen national") solely by manifesting permanent allegiance to the United States. He asserts that his enrollment and service in the U.S. Army (which required that he swear allegiance to the U.S. Constitution), his application for naturalization (which required that he swear he was willing to take an oath of allegiance to the United States), his registration for the Selective Service, his "complete immersion in American Society," and his lack of ties to the Dominican Republic together demonstrate that he owes permanent allegiance to the United States.[8]

---

7. Because we find, below, that Marquez–Almanzar's nationality claim is not meritorious, we assume for present purposes that his petition was properly exhausted (a fact not contested by the parties) and that the BIA's January 31 order was a final order of removal that we can review on the merits. The jurisdictional prerequisites to our consideration of the merits in this case are imposed by statute, not the Constitution, and thus are not a bar to our assumption of "hypothetical jurisdiction" where, as here, the jurisdictional issues are complex and the substance of the claim is plainly without merit. *See Abimbola v. Ashcroft,* 378 F.3d 173, 180 (2d Cir.2004); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 816 n. 11 (2d Cir.2000); *see also Restoration Pres. Masonry, Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 59–60 (1st Cir.2003) (citing cases).

8. Marquez–Almanzar bolsters his construction of § 1101(a)(22) (B) by reference to international law, which, he argues, "determines nationality by examining the habitual residence, family ties, attachments, and participation in public life of the individual," and "disfavors a definition of national that would render individuals stateless." He contends that under Dominican law an individual loses citizenship if he serves in a foreign army, and that his service in the U.S. Army thus stripped him of Dominican citizenship. The government disputes this characterization of Dominican law. Because the issue is immaterial to our disposition of this case, we do not decide it.

We have previously indicated that Marquez–Almanzar's construction of § 1101(a)(22)(B) is erroneous, but have not addressed the issue at length. In *Oliver v. INS*, 517 F.2d 426, 427 (2d Cir. 1975) (*per curiam*), the petitioner, as a defense to deportation, argued that she qualified as a U.S. national under § 1101(a)(22) (B) because she had resided exclusively in the United States for twenty years, and thus " 'owe[d] allegiance' " to the United States. Without extensively analyzing the statute, we found that the petitioner could not be "a 'national' as that term is understood in our law." *Id.* We pointed out that the petitioner still owed allegiance to Canada (her country of birth and citizenship) because she had not taken the U.S. naturalization oath, to " 'renounce and abjure absolutely and entirely all allegiance and fidelity to any [foreign state of] . . . which the petitioner was before a subject or citizen.' " *Id.* at 428 (quoting INA § 337(a)(2), 8 U.S.C. § 1448(a)(2)). In making this observation, we did not suggest that the petitioner in *Oliver* could have qualified as a U.S. national by affirmatively renouncing her allegiance to Canada or otherwise swearing "permanent allegiance" to the United States. In fact, in the following sentence we said that Title III, Chapter 1 of the INA[9] "indicates that, with a few exceptions not here pertinent, one can satisfy [8 U.S.C. § 1101(a)(22)(B) ] only at birth; thereafter the road lies through naturalization, which leads to becoming a citizen and not merely a 'national.' "[10] *Id.* at 428.

Our conclusion in *Oliver*, which we now reaffirm, is consistent with the clear meaning of 8 U.S.C. § 1101(a)(22)(B), read in the context of the general statutory scheme. The provision is a subsection of 8 U.S.C. § 1101(a). Section 1101(a) defines various terms as they are used in our immigration and nationality laws, U.S.Code tit. 8, ch. 12, *codified at* 8 U.S.C. §§ 1101–1537. The subsection's placement indicates that it was designed to describe the attributes of a person who has already been deemed a non-citizen national elsewhere in Chapter 12 of the U.S.Code, rather than to establish a means by which one may obtain that status. For example, 8 U.S.C. § 1408, the only statute in Chapter 12 expressly conferring "non-citizen national" status on anyone, describes four categories of persons who are "nationals, but not citizens, of the United States at birth." All of these categories concern persons who were either born in an "outlying possession" of the United States, *see* 8 U.S.C. § 1408(1), or "found" in an "outlying possession" at a young age, *see id.* § 1408(3), or who are the children of non-citizen nationals, *see id.* §§ 1408(2) & (4).[11] Thus, § 1408 establishes a category of persons who qualify as non-citizen nationals; those who qualify, in turn, are described by § 1101(a)(22)(B) as owing "permanent allegiance" to the United States. In this context the term "permanent allegiance" merely describes the nature of the relationship between non-citizen nationals and the United States, a relationship that has already been created by another statutory provision. *See Barber v. Gonzales*, 347 U.S. 637, 639, 74 S.Ct. 822, 98 L.Ed. 1009 (1954) ("It is conceded that respondent was born a national of the United States;

---

**9.** Chapter 1, codified at 8 U.S.C. §§ 1401–09, is entitled "Nationality at Birth and Collective Naturalization."

**10.** The "exceptions" alluded to were presumably those explicitly described in INA Title III, Chapter 1. *See, e.g.,* 8 U.S.C. § 1407(a)(1)

(granting citizenship to certain residents of Guam as of a particular date).

**11.** The "outlying possessions of the United States" are American Samoa and Swains Island. *See* 8 U.S.C. § 1101(a)(29).

that as such he owed permanent allegiance to the United States ...."); *cf.* Philippines Independence Act of 1934, § 2(a)(1), Pub.L. No. 73–127, 48 Stat. 456 (requiring the Philippines to establish a constitution providing that "pending the final and complete withdrawal of the sovereignty of the United States[,] ... [a]ll citizens of the Philippine Islands shall owe allegiance to the United States").

Other parts of Chapter 12 indicate, as well, that § 1101(a)(22) (B) describes, rather than confers, U.S. nationality. The provision immediately following § 1101(a)(22) defines "naturalization" as "the conferring of nationality of a state upon a person after birth, by any means whatsoever." 8 U.S.C. § 1101(a)(23). If Marquez–Almanzar were correct, therefore, one would expect to find "naturalization by a demonstration of permanent allegiance" in that part of the U.S.Code entitled "Nationality Through Naturalization," *see* INA tit. 8, ch. 12, subch. III, pt. II, *codified at* 8 U.S.C. §§ 1421–58. Yet nowhere in this elaborate set of naturalization requirements (which contemplate the filing by the petitioner, and adjudication by the Attorney General, of an application for naturalization, *see, e.g.,* 8 U.S.C. §§ 1427, 1429), did Congress even remotely indicate that a demonstration of "permanent allegiance" alone would allow, much less require, the Attorney General to confer U.S. national status on an individual.

Finally, the interpretation of the statute underlying our decision in *Oliver* comports with the historical meaning of the term "national" as it is used in Chapter 12. The term (which as §§ 1101(a)(22)(B) and 1408 indicate, includes, but is broader than, "citizen") was originally intended to account for the inhabitants of certain territories– territories said to "belong to the United States," including the territories acquired from Spain during the Spanish–American War, namely the Philippines, Guam, and Puerto Ricoin the early twentieth century, who were not granted U.S. citizenship, yet were deemed to owe "permanent allegiance" to the United States and recognized as members of the national community in a way that distinguished them from aliens. *See* 7 Charles Gordon *et al., Immigration Law and Procedure,* § 91.01[3][b] (2005); *see also Rabang v. Boyd,* 353 U.S. 427, 429–30, 77 S.Ct. 985, 1 L.Ed.2d 956 (1957) ("The Filipinos, as nationals, owed an obligation of permanent allegiance to this country.... In the [Philippine Independence Act of 1934], the Congress granted full and complete independence to [the Philippines], and necessarily severed the obligation of permanent allegiance owed by Filipinos who were nationals of the United States."). The term "non-citizen national" developed within a specific historical context and denotes a particular legal status. The phrase "owes permanent allegiance" in § 1101(a)(22)(B) is thus a term of art that denotes a legal status for which individuals have never been able to qualify by demonstrating permanent allegiance, as that phrase is colloquially understood.[12]

▮ We hold, therefore, that one cannot qualify as a U.S. national under 8 U.S.C. § 1101(a)(22)(B) by a manifestation of

---

**12.** In the early years of the twentieth century, the distinction between citizens and noncitizen nationals was an important one. Many of our insular possessions were not regarded as fully incorporated into the United States, and their inhabitants were not accorded full rights of citizenship. With the grant of independence to the Philippines, and the gradual extension of citizenship rights to the indigenous inhabitants of other insular possessions, the distinction between citizenship and noncitizen nationality has become less significant.

7 Gordon *et al., Immigration Law and Procedure,* § 91.01[3][b] (internal footnote omitted); *see also Oliver,* 517 F.2d at 428 n. 3 (quoting earlier version of the same treatise). The people of Puerto Rico were collectively

"permanent allegiance" to the United States. As we said in *Oliver*, the road to U.S. nationality runs through provisions detailed elsewhere in the Code, *see* 8 U.S.C. §§ 1401–58, and those provisions indicate that the only "non-citizen nationals" currently recognized by our law are persons deemed to be so under 8 U.S.C. § 1408. Our holding is consistent with the BIA's own interpretation of the statute, *see In re Navas–Acosta*, Interim Dec. (BIA) 3489, 23 I. & N. Dec. 586, 2003 WL 1986475 (BIA 2003), and the decisions of other circuits, *see Sebastian–Soler v. U.S. Att'y Gen.*, 409 F.3d 1280, 1285 (11th Cir. 2005); *United States v. Jimenez–Alcala*, 353 F.3d 858, 861–62 (10th Cir.2003); *Perdomo–Padilla v. Ashcroft*, 333 F.3d 964, 966–67 (9th Cir.2003), *cert. denied* 540 U.S. 1104, 124 S.Ct. 1041, 157 L.Ed.2d 887 (2004). To the extent that *United States v. Morin*, 80 F.3d 124 (4th Cir.1996) applies in this context, we disagree with the reasoning of that court.[13]

It follows from our holding that Marquez–Almanzar is not a U.S. national, but rather an alien subject to removal under 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i).

## II. Claim of Prima Facie Eligibility for Citizenship

Marquez–Almanzar asks, in the alternative, that we remand his case for consideration of whether he has established prima facie eligibility for U.S. citizenship. While his brief does not explain why such a showing would entitle him to relief, we assume his claim is that the IJ erred in refusing to terminate removal proceedings under former 8 C.F.R. § 239.2(f). As we have noted, *see supra*, during his removal proceedings Marquez–Almanzar had an application pending for naturalization under INA § 329, 8 U.S.C. § 1440, which relaxes naturalization requirements for those who have served in the U.S. military on active-duty status during wartime. Marquez–Almanzar argues that the IJ erred when it found that because he had been convicted of an "aggravated felony," as defined by 8 U.S.C. § 1101(a)(43), he was barred by 8 U.S.C. § 1101(f)(8) from demonstrating the good moral character requisite to naturalization under § 1440.

We recently rejected the same argument in *Boatswain v. Gonzales*, 414 F.3d 413, 2005 WL 1532319 (2d Cir.2005), in which we held that the aggravated felony bar in § 1101(f) (8) applies to applicants for naturalization under § 1440 based on prior wartime military service. Applying *Boatswain* to this case, we conclude that the IJ's ruling was correct.

## CONCLUSION

For the foregoing reasons, the petition for review is DENIED.

---

naturalized by the Jones Act of 1917, ch. 145, § 5, 39 Stat. 951 (1917) (current version codified at 8 U.S.C. § 1402). The people of Guam became citizens of the United States by virtue of the Organic Act of Guam, ch. 512, § 4, 64 Stat. 384 (1950) (current version codified at 8 U.S.C. § 1407).

13. In *Morin*, the Fourth Circuit considered the meaning of § 1101(a)(22)(B) in deciding whether the defendant's plan to murder an individual residing outside the United States violated the federal murder-for-hire statute (federal law prohibits the murder of "a national of the United States, while such national is outside the United States," 18 U.S.C. § 2332(a)). The court found that the intended victim was indeed a U.S. national under § 1101(a)(22), as he had demonstrated "permanent allegiance" by obtaining permanent residence status and applying for U.S. citizenship. *See Morin*, 80 F.3d at 126. The court provided little reasoning for its conclusion and did not address the issue at length.