08-6128-ag
Duarte v. Holder

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2009

Argued:   January 14, 2010          Decided: December 6, 2010

Docket No. 08-6128-ag

_____

RAMÓN ANTONIO DUARTE-CERI,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General
of the United States,[*]

Respondent.

_____

Before:   HALL, LIVINGSTON, and CHIN,[**] Circuit Judges.

Judge LIVINGSTON dissents in a separate opinion.

Petition for review of a decision of the Board of
Immigration Appeals denying a motion to reopen removal
proceedings.  Petitioner contends that his removal is improper
because he is a U.S. citizen by operation of a former provision
of the Immigration and Nationality Act.  We TRANSFER the

_____

[*]      Pursuant to Federal Rule of Appellate Procedure
43(c)(2), Attorney General Eric H. Holder, Jr. is automatically
substituted for former Attorney General Michael B. Mukasey.

[**]      At the time of oral argument, Judge Chin was a District
Judge sitting by designation.

proceedings to the district court for factual findings and HOLD

IN ABEYANCE the petition for review.

                         AMY V. MESELSON (Steven Banks, Adriene
                              L. Holder, Scott A. Rosenberg, Jojo
                              Annobil, and Maria Navarro, on the
                              brief), The Legal Aid Society, New
                              York, NY, for Petitioner.

                         YAMILETH G. HANDUBER (Tony West, Terri
                              J. Scadron, and Corey L. Farrell,
                              on the brief), U.S. Department of
                              Justice, Washington, DC, for
                              Respondent.

CHIN, Circuit Judge:

On June 14, 1973, petitioner Ramón Antonio Duarte-Ceri ("Duarte") was born in the Dominican Republic. On June 14, 1991 -- eighteen years later to the day -- Duarte's mother was naturalized as a U.S. citizen in New York. The parties and the Immigration Judge below assumed that Duarte was born in the evening and that his mother was naturalized in the morning. The question presented is whether Duarte was still "under the age of eighteen years" when his mother took the naturalization oath. If so, Duarte acquired derivative U.S. citizenship from his mother by operation of law, and he is not subject to removal from the United States. If not, he is not a U.S. citizen, and he will be deported to the Dominican Republic. We hold, on the assumed facts, that Duarte was still "under the age of eighteen years"

when his mother was naturalized.  Because there has been no factual finding as to the actual timing of Duarte's birth, however, we transfer the case to the district court for a "new hearing on the nationality claim," pursuant to 8 U.S.C. § 1252(b)(5)(B).

STATEMENT OF THE CASE

A.  The Facts

In the proceedings below, the parties assumed the following facts:

Duarte was born in the Dominican Republic on the evening of June 14, 1973.  He was admitted to the United States as a lawful permanent resident in 1981, when he was eight years old.  On July 24, 1989, Duarte's parents divorced in New York. The divorce decree granted Duarte's mother, Carmen Paula Duarte, sole custody of Duarte and his younger brother.  Duarte was sixteen years old when his mother applied for citizenship on February 5, 1990.  Her application was granted on March 15, 1991, and she took the oath of citizenship on the morning of June 14, 1991 -- the same day as Duarte's eighteenth birthday.

Between 1989 and 1995, Duarte was arrested at least three times.  In 1990, he was charged with assault, and sentenced as a youthful offender.  In 1991, Duarte pled guilty to possessing stolen property.  Then, in 1994, Duarte pled guilty to

- 3 -

attempted sale of a controlled substance. On April 14, 1995, the Immigration and Naturalization Service served Duarte with an Order to Show Cause, charging that he was subject to deportation as a non-citizen convicted of a controlled substance offense and an aggravated felony. See 8 U.S.C. § 1227(a)(2)(B)(i) (controlled substance conviction); id. § 1227(a)(2)(A)(iii) (aggravated felony conviction). Duarte admitted the allegations against him, and applied for a waiver of excludability. On February 24, 1997, the Immigration Judge ("IJ") denied the application for a waiver, and ordered Duarte deported to the Dominican Republic. The Board of Immigration Appeals (the "BIA") affirmed on September 5, 2001.

B. Procedural History

Starting in November 2004, Duarte pursued a variety of procedural strategies to press his argument that he is actually a U.S. citizen by operation of former section 321(a) of the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1432(a) (1999), repealed by Pub. L. 106-395, § 103(a), 114 Stat. 1631, 1632 (2000). That provision grants derivative citizenship to certain children whose parents are naturalized while they are still "under the age of eighteen years." Duarte's mother was naturalized on the morning of June 14, 1991. Duarte argues that he qualifies for derivative citizenship because he was born in

the evening, and he did not actually reach the age of eighteen years until the evening of June 14, 1991.

Though the BIA did reopen Duarte's case and remand to the IJ on one occasion to consider this issue, the IJ eventually ruled that the precise hour of birth was not relevant to the derivative citizenship inquiry because Duarte "was 18 when that clock moved past midnight [on June 14, 1991]." As a consequence, the IJ did not make any findings of fact as to what time of day Duarte was born on June 14, 1973. On appeal, the BIA agreed with the IJ that the precise timing was not relevant, concluding that "in computing the child's age for derivative citizenship purposes under the applicable statute, the designated age of maturity will be attained at 12:01 a.m. on the applicable anniversary day."

Duarte has also filed an application for citizenship with U.S. Citizenship and Immigration Services ("USCIS"), a federal habeas corpus petition, and several more motions to reopen at the BIA. USCIS denied Duarte's application, and the Administrative Appeals Office dismissed Duarte's appeal from the denial. The federal district court dismissed the habeas petition, concluding that it did not have jurisdiction over the matter. Duarte-Ceri v. Napolitano, No. 07 Civ. 500A (RJA), 2009 WL 1806694 (W.D.N.Y. June 23, 2009).

On October 23, 2008, the BIA declined to exercise its

sua sponte authority to reopen Duarte's case another time. Duarte is now before this Court on a petition for review from the BIA's decision declining to reopen removal proceedings.

DISCUSSION

A.   Jurisdiction

Duarte's claim to derivative citizenship presents an issue of law over which we have jurisdiction.  See 8 U.S.C. § 1252(a)(2)(D) (judicial review preserved as to constitutional claims or questions of law); id. § 1252(b)(5)(A) ("If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.").

Although Duarte's claim comes to us in the posture of a petition for review from the BIA's refusal to reopen removal proceedings sua sponte -- a discretionary decision that is normally not reviewable by the Courts of Appeals, see Ali v. Gonzales, 448 F.3d 515, 518 (2d Cir. 2006) -- here, Duarte's legal claim encounters no jurisdictional obstacle because the Executive Branch has no authority to remove a citizen.  An assertion of U. S. "citizenship is thus a denial of an essential jurisdictional fact" in a deportation proceeding.  Ng Fung Ho v. White, 259 U.S. 276, 284 (1922); see also Frank v. Rogers, 253

- 6 -

F.2d 889, 890 (D.C. Cir. 1958) ("Until the claim of citizenship is resolved, the propriety of the entire proceeding is in doubt.").

B.  Merits

To resolve the legal question presented, we assume the facts assumed by the parties and the IJ below -- that Duarte was born the evening of June 14, 1973 and his mother was naturalized the morning of June 14, 1991.

"To determine whether a petitioner obtains derivative citizenship, the court "appl[ies] the law in effect when [petitioner] fulfilled the last requirement [to qualify]." Ashton v. Gonzales, 431 F.3d 95, 97 (2d Cir. 2005).  At the time Duarte's mother received her citizenship in 1991, section 321(a) of the INA provided, in relevant part:

> A child born outside the United States of alien
> parents . . . becomes a citizen of the United
> States upon fulfillment of the following
> conditions: . . .
>
> (3)  The naturalization of the parent having legal
> custody of the child when there has been a legal
> separation of the parents or the naturalization of
> the mother if the child was born out of wedlock and
> the paternity of the child has not been established
> by legitimation; and if
>
> (4)  Such naturalization takes place while such
> child is unmarried and under the age of eighteen
> years; and
>
> (5)  Such child is residing in the United States
> pursuant to a lawful admission for permanent

> residence at the time of the naturalization of the parent . . . naturalized under clause . . . (3).

8 U.S.C. § 1432(a) (emphasis added) (repealed 2000).[1]

Duarte meets condition (3) because at the time his mother was naturalized, she had sole legal custody of him under a valid divorce decree. He also meets condition (5) because he began to reside in the United States as a lawful permanent resident in 1981, when he was eight years old. In terms of condition (4), Duarte was unmarried at the time of his mother's naturalization. The question we must address is whether Duarte still qualified as "under the age of eighteen years" when his mother was naturalized on the morning of his eighteenth birthday.

The language of the statute is ambiguous. The phrase "under the age of eighteen years" is susceptible to two meanings. On one hand, it could refer to an applicant who has not yet reached the eighteenth anniversary of his birth. Under this interpretation, Duarte's claim fails, for he had reached the eighteenth anniversary of his birth when his mother was naturalized. On the other hand, it could refer to an applicant who has not yet lived in the world for eighteen years. Under this interpretation, on the assumed facts, Duarte's claim prevails, for, as a matter of biological fact, on the morning of

---

[1]   Subsections (1) and (2) are not relevant to Duarte's petition.

June 14, 1991, Duarte had not yet lived for eighteen years. Rather, he had lived approximately seventeen years, 364 days, and twelve hours.

Faced with two plausible readings of the statutory language, and a congressional direction to "decide the nationality claim," we conclude that the circumstances of this case and principles of statutory construction require us to adopt the interpretation that preserves rather than extinguishes citizenship.[2]

First, on the assumed facts, as a factual matter Duarte had not lived eighteen years when his mother was

_____

[2] Although the Government did not argue in its brief that the BIA's interpretation of former INA § 321(a) was entitled to deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), it did so in a subsequent submission pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure. We reject the argument. "While the BIA's interpretation of immigration statutes is generally entitled to Chevron deference, interpretations in non-precedential unpublished BIA decisions . . . are not so entitled." Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) (citing Mendis v. Filip, 554 F.3d 335, 338 (2d Cir. 2009)). The BIA's 2008 decision in Duarte's case is a non-precedential, unpublished decision. Indeed, the BIA has never formally codified the view expressed in its decision in this case -- namely, that the "age of maturity will be attained at 12:01 a.m. on the applicable anniversary day (21st, 18th, or 16th) of the child's birth." In re Ramon Antonio Duarte-Ceri, No. A37 161 007 (B.I.A. Nov. 21, 2005). Instead, in the BIA's only published decision in which the agency encountered the situation we face today -- where a crucial event occurs on the same day as the applicant's birthday -- the BIA took a lenient view. See Matter of L-M- and C-Y-C-, 4 I. & N. Dec. 617 (B.I.A. Feb. 20, 1952). We discuss this case more thoroughly infra.

naturalized.  Under the BIA's decision, he would be deported only because of the application of a legal fiction -- that he turned eighteen years of age at the stroke of midnight on the eighteenth anniversary of his birth.

Second, the Supreme Court has long held that "whenever it becomes important to the ends of justice, . . . the law will look into fractions of a day, as readily as into the fractions of any other unit of time."  Town of Louisville v. Portsmouth Sav. Bank, 104 U.S. 469, 474 (1881); accord Taylor v. Brown, 147 U.S. 640, 645-46 (1893) ("as to the general doctrine that the law does not allow of fractions of a day, it is settled that, when substantial justice requires it, courts may ascertain the precise time when . . . an act [is] done").  The legal fiction that a day is indivisible is a rule of convenience that is satisfactory only as long as it does not operate to destroy an important right. See In re Gubelman, 10 F.2d 926, 930 (2d Cir. 1925).  "There is no indivisible unity about a day which forbids us, in legal proceedings, to consider its component hours, any more than about a month, which restrains us from regarding its constituent days. The law is not made of such unreasonable and arbitrary rules." Portsmouth Sav. Bank, 104 U.S. at 475.  In the bankruptcy context, for example, courts have long considered fractions of

days to determine certain rights.[3]

Third, here, it is important to the ends of justice to parse the day into hours, for "the most precious right" of citizenship is at stake.  Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159 (1963).  "The stakes are indeed high and momentous," Delgadillo v. Carmichael, 332 U.S. 388, 391 (1947), for "deportation is a drastic measure and at times the equivalent of banishment or exile."  Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948).  If we abide by the legal fiction that a day is indivisible for these purposes, then Duarte forfeited his right to be a U.S. citizen and he will be deported.  And although he grew up in the United States and his mother, brother, and children are all U.S. citizens, he will be separated from them.

We cannot, and do not, contest that in "everyday speech and writing," people often use the phrases "under the age of eighteen" and "before one's eighteenth birthday" interchangeably.

---

[3] See, e.g., Vanco Trading, Inc. v. Monheit (In re K Chemical Corp.), 188 B.R. 89, 95-96 (Bankr. D. Conn. 1995) (holding that although fractions of a day are generally disregarded in court proceedings, "the fractionalization approach is uniformly utilized in a wide range of Bankruptcy Code disputes involving temporal concepts"); In re Dejay Stores, Inc., 220 F. Supp. 497, 501 (S.D.N.Y. 1963) (where two bankruptcy petitions were filed two minutes apart on the same day, holding that "legal fiction that a day is an indivisible period of time" should be disregarded where ignoring the time differential would deprive first petitioning creditors of right to nominate and elect trustee).  Though the dissent argues that bankruptcy is the only context in which the law parses days, as we discuss herein, this is not correct.

This linguistic imprecision is a matter of convenience -- related to the legal fiction that a day is indivisible -- and in the vast majority of contexts, it simply does not matter one way or another. In particular, it is significant that in most contexts, an individual gains a right or privilege when he reaches the "age of eighteen" -- to take the dissent's examples: he is permitted to buy lottery tickets, work in a public school, sell alcoholic beverages, visit strip clubs, and, if he is a United States citizen, he may vote or serve as a juror. Here, Duarte stands to suffer a great loss, predicated on a rule of convenience. That it may be somewhat inconvenient to calculate Duarte's precise age should not be a deterrent because circumstances like these are not common occurrences.

To the extent that the dissent argues that "the ends of justice" is too malleable a standard for courts to apply, we disagree. Courts apply this standard in contexts as varied as the grant of a continuance in a criminal prosecution, see 18 U.S.C. § 3161(h)(7)(A), the application of the hearsay rule, see Chambers v. Mississippi, 410 U.S. 284, 302 (1973), the adjudication of successive habeas claims, see Schlup v. Delo, 513 U.S. 298, 320 (1995), and the relaxation of procedural rules, see Schacht v. United States, 398 U.S. 58, 64 (1970). In short, courts are entrusted with determinations based on the "ends of justice" each and every day; indeed, such determinations are at

- 12 -

the heart of judicial decision-making, preventing mechanical interpretations of rules from devolving into injustice.

In the immigration context, there is a long-standing presumption to construe "any lingering ambiguities" in favor of the petitioner. INS v. Cardoza-Fonsesca, 480 U.S. 421, 449 (1987). Here, Congress enacted the derivative citizenship statute to ensure that "alien children whose real interests were located in America with their custodial parent, and not abroad, should be automatically naturalized." Bustamante-Barrera v. Gonzales, 447 F.3d 388, 397 (5th Cir. 2006) (internal quotation marks omitted). The statute "implements the underlying intention of our immigration laws regarding the preservation of the family unit." H.R. Rep. No. 82-1365, at 24 (1952), as reprinted in 1952 U.S.C.C.A.N. 1653, 1680. It is consistent with Congress's remedial purposes, therefore, to interpret the statute's ambiguity with leniency, and we should interpret the statute here in a manner that will keep families intact.

It is noteworthy that the statute did not provide that a parent's naturalization had to take place "before the child attains his eighteenth birthday" or "prior to the child's eighteenth birthday." This language would be unambiguous because the entirety of June 14, 1991 was Duarte's eighteenth birthday -- from 12:00 a.m. until 11:59 p.m. No matter what time Duarte was

born, his mother was not naturalized "prior to his eighteenth birthday."  Indeed, Congress has actually employed similar unambiguous age-related phrasing elsewhere in the INA.  See, e.g., 8 U.S.C. § 1483(b) ("A national . . . shall not be deemed to have lost United States nationality by the commission, prior to his eighteenth birthday, of any of [enumerated acts]."); id. § 1101(a)(27)(I)(i) (referring to certain conditions that must be performed "no later than [one's] twenty-fifth birthday" to qualify as a "special immigrant"); see also 18 U.S.C. § 5031 ("For the purposes of this chapter, a 'juvenile' is a person who has not attained his eighteenth birthday.").  On the other hand, if the words "under the age of eighteen years" are given their literal meaning, Duarte was eligible to become a citizen derivatively because he was still "under the age of eighteen years" when his mother was naturalized -- he apparently had lived only for approximately seventeen years, 364 days, and twelve hours.

We cannot simply dismiss the difference in language between former INA § 321(a) ("a child . . . under the age of eighteen years") and 18 U.S.C. § 5031 ("a person who has not attained his eighteenth birthday") as inadvertent or immaterial. In 1948, Congress took the affirmative step of eliminating ambiguity in 18 U.S.C. § 5031 by amending it to replace the phrase "seventeen years of age or under" with "who has not

attained his eighteenth birthday."  18 U.S.C. § 5031 Notes to 1948 Acts.  It did so after a district judge wrote to express "the necessity of a definite fixing of the age of [a] juvenile." Id.  Congress could have made a similar change to the statutory language here, but it did not.

In 1952, the BIA, in a published decision, interpreted a citizenship statute that required a child born to U.S. citizens outside the United States to take up residence in the United States "by the time he reaches the age of 16 years" to retain his U.S. citizenship.  See In re L-M- and C-Y-C-, 4 I. & N. Dec. at 618 (quoting Nationality Act of 1940 § 201(g)).  The two appellants returned to the United States on their sixteenth birthday, one at 4 a.m. and the other at 8 a.m.  The government argued that they were too late because they had turned sixteen at 12:01 a.m., and thus arrived after they had reached the age of sixteen.  Id.  The BIA rejected the argument, and ruled that it was sufficient that the appellants arrived on the day they turned sixteen.  It held that, when considering "the great privilege of citizenship," "the method of arriving at the computation is to be in the interest of the person affected by it."  Id. at 620.  The BIA concluded that:

> A divestiture of American citizenship should
> not be predicated upon an ambiguity.  Where
> the language of the statute is capable of
> more than one construction, that construction

is favored by the law which will best
preserve a right or prevent a forfeiture.

Id. at 621.[1]

These principles apply with equal force here.  Where a
statute conferring citizenship derivatively is susceptible of two
interpretations, the only difference being the divisibility of a
unit of time, the law favors the interpretation that preserves
the right of citizenship over the interpretation that forfeits
it.  On the assumed facts, we conclude that Duarte was "under the
age of eighteen years" when his mother was naturalized.

C.   Transfer

In the context of removal proceedings, claims that a
petitioner is a U.S. national are governed by 8 U.S.C. §
1252(b)(5).  The court of appeals "shall" decide such nationality
claims if it "finds from the pleadings and affidavits that no
genuine issue of material fact about the petitioner's nationality
is presented.  8 U.S.C. § 1252(b)(5)(A).  If, however, the court
of appeals concludes that "a genuine issue of material fact about
the petitioner's nationality is presented, the court shall
transfer the proceeding to the district court of the United
States for the judicial district in which the petitioner resides

_____

[1]     The dissent notes that this case has not frequently
been cited.  Likely, this is because it is such a rare
circumstance that the final qualifying citizenship event occurs
on the same day as the applicant's crucial birthday.

- 16 -

for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28."  8 U.S.C. § 1252(b)(5)(B).  We determine the existence of a genuine issue of material fact for these purposes using the same principles employed on a Rule 56 motion for summary judgment.  See Agosto v. INS, 436 U.S. 748, 754 (1978); Ayala-Villanueva v. Holder, 572 F.3d 736, 738 (9th Cir. 2009).

In the removal proceedings, the parties and the IJ assumed that Duarte was born the evening of June 14, 1973, but the IJ determined there was no need for factual findings in that respect because the time of the birth was legally insignificant. Duarte submitted affidavits from his mother as well as a nurse who purportedly participated in the delivery stating that Duarte was born at approximately 9 p.m. on June 14, 1973.  The Government did not submit any evidence to contradict the affidavits, but there was no reason for it to do so because of the IJ's ruling on the legal question.[5]  The issue is now squarely presented because of our conclusion that the precise

---

[5]     We note that in its brief on appeal, the Government states that "there is no genuine issue of material fact regarding Duarte's citizenship claim" and that "the issues presented on this citizenship claim are purely legal."  Under the circumstances, we do not construe this as a concession that Duarte in fact was born in the evening on June 14, 1973.

timing of Duarte's birth on June 14, 1973, is relevant. Accordingly, we transfer the matter to the United States District Court for the Western District of New York for a new hearing on Duarte's nationality claim, pursuant to 8 U.S.C. § 1252(b)(5)(B).[6]

CONCLUSION

For the reasons set forth above, we TRANSFER this proceeding to the United States District Court for the Western District of New York, and HOLD IN ABEYANCE his petition for review.

---

[6]     The most recent indication in the record is that Duarte "resides" at the Buffalo Detention Facility in Batavia, New York, in the Western District of New York.

DEBRA ANN LIVINGSTON, Circuit Judge, dissenting:

Petitioner Ramon Antonio Duarte-Ceri ("Duarte") is a 37-year-old native of the Dominican Republic who entered this country as a lawful permanent resident in 1981, when he was eight years old. Brought here by his parents as a child, Duarte could have applied to be a citizen at any time on or after June 14, 1991, when he turned eighteen. Unfortunately, he never did so. Instead, Duarte compiled an "extensive criminal history in this country, including convictions for violent and controlled substance crimes," In re Ramon Antonio Duarte-Ceri, No. A037 161 007 (B.I.A. Sept. 5, 2001), that now renders him ineligible for citizenship. Duarte was ordered deported by an Immigration Judge in February 1997 and this decision was affirmed by the Board of Immigration Appeals ("BIA") in 2001. Duarte did not leave the country, nor did he appeal the BIA decision to this Court, but he did file an untimely motion to reopen some three years later, in 2004. In this motion he argued for the first time that he cannot be deported because he is a United States citizen by virtue of his mother's naturalization on June 14, 1991, the day he turned eighteen. The BIA rejected this argument in 2005, and an appeal of that BIA decision was voluntarily dismissed before this Court. The Board rejected a later motion to reopen, prompting the present petition for review.

This is, or should be, a straightforward case of statutory

- 1 -

interpretation.  As relevant here, the former derivative citizenship statute applicable in Duarte's case provides that a child born outside the United States of non—U.S. citizen parents becomes a citizen upon the naturalization of a parent when: (1) the naturalized parent is the parent "having legal custody of the child when there has been a legal separation of the parents"; (2) the child is residing here "pursuant to a lawful admission for permanent residence at the time of the naturalization"; and finally (3) "such naturalization takes place while such child is unmarried and under the age of eighteen years."  8 U.S.C. § 1432(a) (emphasis added) (repealed 2000) (hereinafter "derivative citizenship statute" or "§ 1432(a)").  The majority concludes that Duarte was "under the age of eighteen years" on June 14, 1991, the day he turned eighteen, until the anniversary of the very moment of his birth eighteen years before in 1973.  Accordingly, the majority determines that Duarte became a citizen on June 14, 1991 so long as his mother's naturalization that day took place before the time at which he was born eighteen years earlier.  Because I cannot concur in this novel and utterly implausible reading of the statute, I respectfully dissent.  The petition for review should be denied.

* * *

In interpreting a statute, we give its terms, read in their appropriate context, their ordinary, common meaning and when the

- 2 -

text, thus read, provides an answer, our work is complete. See, e.g., Bilski v. Kappos, 130 S. Ct. 3218, 3226 (2010) ("[I]n all statutory construction, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (internal quotation marks and alteration omitted)); Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous . . . this first canon [of statutory construction] is also the last: judicial inquiry is complete." (internal quotation marks omitted)). Where the language of the statute makes its meaning clear, "we [should] decline to manufacture ambiguity where none exists." United States v. Batchelder, 442 U.S. 114, 122 (1979) (internal quotation marks omitted). We should not prefer an implausible reading of a statute's language to its "ordinary, contemporary, common meaning, absent an indication Congress intended" a different reading. Williams v. Taylor, 529 U.S. 420, 431 (2000) (internal quotation marks omitted).

These incontrovertible principles should end this case because the ordinary, common meaning of the phrase "under the age of eighteen" is "before one's eighteenth birthday." This is reflected in everyday speech and writing.[1] Judges have also found this

---

[1] By way of example: (1) "CC Sabathia leads all major leaguers under the age of 30 in career wins . . . . Who is the last one to have as many wins as Sabathia before his 30th

obvious in construing statutes that use the phrase "under the age" — including the very statute the majority purports to construe. See, e.g., Poole v. Mukasey, 522 F.3d 259, 265 (2d Cir. 2008) (noting in context of § 1432(a) derivative citizenship claim that "the final inquiry focuses on whether Poole's mother received her citizenship prior to Poole's eighteenth birthday."); Bustamante-Barrera v. Gonzales, 447 F.3d 388, 390 (5th Cir. 2006) ("Prior to its amendment . . . , § 1432(a) granted derivative citizenship to a child born outside the United States to alien parents if, before that child's eighteenth birthday, [the statute's requirements were satisfied]."); Tabucbuc v. Ashcroft, 84 F. App'x 966, 968 (9th Cir. 2004) (mem.) (conditions set forth in 8 U.S.C. § 1432(a) must be "met prior to [the petitioner's] eighteenth birthday"); Batista v.

---

birthday?" Peter Botte et al., Teix: No Respect, New York Daily News, May 19, 2010 at 58; (2) "Most toddlers under the age of two have already spent some time in front of the TV, . . . even though it is recommended they get no screen time before their second birthday." Laura Stone, "Dangerous" Inactivity Puts Children at Risk, Ottawa Citizen, Apr. 27, 2010, at A8; (3) "You need a special salmon license. That license will cost you . . . $5 if you're a non-resident under the age of 16. Mainers who haven't reached their 16th birthday are exempt from any fee." John Holyoke, Any-Deer Permits Are More Hope for Hunters, Bangor Daily News, Sept. 9, 2006, at D1; (4) "[B]efore his 30th birthday earlier this month he was Britain's richest sportsman under the age of 30." What's in a Name . . . , The Irish Times, Apr. 18, 2005, at 7; (5) "More than half of women and almost three-quarters of men have had intercourse before their 18th birthday[.] [I]n the mid-1950s, by contrast, just over a quarter of women under age 18 were sexually experienced . . . ." Allan Gutmacher Inst., Sex and America's Teenagers 8 (1994).

- 4 -

Ashcroft, 270 F.3d 8, 16 (1st Cir. 2001) ("The remaining question is whether the evidence submitted by petitioner . . . present[s] a genuine issue of material fact as to whether [the requirements for derivative citizenship were satisfied] prior to Batista's eighteenth birthday."); Wedderburn v. INS, 215 F.3d 795, 796 (7th Cir. 2000) (observing that pursuant to § 1432(a), "[c]hildren born outside the United States, of alien parents, acquire U.S. citizenship automatically if before their eighteenth birthday they move to the United States, and one or both of their parents become U.S. citizens"). Duarte was therefore not "under the age of eighteen" for purposes of § 1432(a) when his mother was naturalized on June 14, 1991 because, on the facts the majority assumes to be true, he was eighteen years old that entire day.

Duarte was eighteen years old the morning of June 14, 1991, not only for the purposes of derivative citizenship, but for every other purpose recognized by law, from momentous to trivial. In New York, for example, a person who has turned eighteen — from the very first minute of that significant birthday — can be employed serving

- 5 -

alcoholic beverages,[2] get married without his parents' consent,[3] work as a teacher in a public school,[4] enter a nude dancing establishment,[5] serve on a jury,[6] operate a powerboat unaccompanied in New York waters,[7] be sold "dangerous fireworks,"[8] apply for any

---

[2] N.Y. Alco. Bev. Cont. Law § 100(2-a) ("No retailer shall employ . . . on any premises licensed for retail sale hereunder, any person under the age of eighteen years, as a hostess, waitress, waiter, or in any other capacity where the duties of such person require or permit such person to sell, dispense or handle alcoholic beverages . . . .").

[3] N.Y. Dom. Rel. Law § 15(2) ("If it shall appear . . . that either party is at least sixteen years of age but under eighteen years of age, then the town or city clerk before he shall issue a [marriage] license shall require the written consent to the marriage from both parents of the minor or minors . . . .").

[4] N.Y. Educ. Law § 3001 ("No person shall be employed or authorized to teach in the public schools of the state who is . . . [u]nder the age of eighteen years.").

[5] N.Y. Gen. Bus. Law § 390-c(1) ("No person under the age of eighteen years shall be admitted to any portion of a facility open to the public wherein performers appear and dance or otherwise perform unclothed . . . .").

[6] N.Y. Judiciary Law § 510 ("In order to qualify as a juror a person must . . . [b]e not less than eighteen years of age.").

[7] N.Y. Nav. Law § 49(1) ("No person under the age of eighteen years shall operate a mechanically propelled vessel on the navigable waters of the state . . . .").

[8] N.Y. Penal Law § 270.00(2)(b)(ii)-(iii) (provisions relating to sale of "dangerous fireworks" to "any person who is under the age of eighteen").

class of adult drivers' license,[9] purchase state lottery tickets,[10] and he can no longer be claimed as a dependent child for purposes of family assistance.[11]  For purposes of federal law, he can, among other things, vote in an election held on his birthday.[12]  These examples are by no means a complete catalogue of the numerous times federal and state statutes use the phrase "under the age of ---" to denote one who has not yet reached a particular birthday, or variants of the phrase "reach the age of ---" to denote one who has reached the birthday in question.  "[T]he reality is that in these situations," among many others, "a person is considered by common practice to be a year older on the first moment of the date of their birth, rather than the exact hour."  State v. Yarger, 908 N.E.2d 462, 468 (Oh. Ct. App. 2009) (rejecting criminal defendant's argument that he should be considered a "child" under Ohio law when crime was committed on his birthday but before exact hour of his

---

[9] N.Y. Veh. & Traf. Law § 502(2)(b)-(c) (provisions relating to licenses for which applicant must be "at least eighteen years of age" to apply absent other qualifications).

[10] N.Y. Tax Law § 1610(a) ("No [New York State Lottery] ticket shall be sold to any person under the age of eighteen years . . . .").

[11] N.Y. Soc. Serv. Law § 349(A) (eligibility requirements for "Family assistance [to] . . . a parent or other relative . . . for the benefit of a child under eighteen years of age").

[12] U.S. Const. amend. XXVI, § 1 (guaranteeing the "right of citizens of the United States, who are eighteen years of age or older, to vote").

birth). These statutes are perfectly clear and unambiguous — or at least they were so, until today.

The majority finds ambiguity in the derivative citizenship statute — and presumably would do so with all the countless other statutes that use the words "under the age," "reaches the age," or some variant thereof — because the words "under the age of eighteen," if "given their literal meaning," Maj. Op. at 15, could "refer to [a person] who has not yet lived in the world for eighteen years," (Id. at 9). But I am aware of no reported case — anywhere, ever — in which a court interpreted the phrase "under the age of ---" in a statute to mean "before the exact time the relevant person was born --- years ago." To the contrary, the courts that have directly confronted the question have uniformly rejected the idea that one's birth hour is relevant to whether a person is a certain age on their birthday for the purposes of statutory construction. See, e.g., State v. Brown, 443 S.W.2d 805, 806-07 (Mo. 1969) (defendant was not subject to jurisdiction of juvenile court because crime was committed on seventeenth birthday, albeit two hours prior to defendant's birth hour, and thus was not committed "prior to [the defendant's] having become seventeen years of age"); Yarger, 908 N.E.2d at 465-68 (collecting numerous cases); State v. Wright, 948 P.2d 677, 680-83 (Kan. Ct. App. 1997) (same); People v. Anderson, 439 N.E.2d 65, 71-72 (Ill. App. Ct. 1982).

- 8 -

The lack of support for the majority's interpretation is unsurprising, as it is obviously contrary to the common understanding of the statutory text read as a whole. Assuming that the word "age" might in some unusual circumstances refer to the precise duration of time that has elapsed since the exact moment of a person's birth, the word cannot be so construed when it is used in the context of a phrase, "under the age," that is itself used in the context of a statute that attempts to draw a dividing line among people of different ages. And we are obligated to read the words of statutes not in artificial isolation, as the majority does, but in their proper context as part of the statute in which they are found. See United States v. Morton, 467 U.S. 822, 828 (1984); Pettus v. Morgenthau, 554 F.3d 293, 296-97 (2d Cir. 2009); see also John F. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2393 (2003) ("[T]he literal or dictionary definitions of words will often fail to account for settled nuances or background conventions that qualify the literal meaning of language and, in particular, of legal language.").

The majority's opinion exemplifies the pitfalls of its unwise alternative interpretive approach. No reasonable reader would read the words of § 1432(a) to refer to a person's so-called "biological" age, Maj. Op. at 9, when it is absolutely clear from context that the statute (being a statute) refers to "age" in a

traditional, legal sense — the same sense in which the phrases "under the age," "over the age," "reaches the age," and the like are always used when used in statutes.  No reader of a typical underage drinking law thinks that it means that a person can buy alcohol on their twenty-first birthday only after the exact minute and hour at which they were born twenty-one years before.  Cf. N.Y. Alco. Bev. Cont. Law § 65 ("No person shall sell, deliver or give away . . . any alcoholic beverages to . . . [a]ny person, actually or apparently, under the age of twenty-one years . . . .").  Nor would a reasonable reader of the Constitution think that if the polls happened to close before a person's birth hour when an election was held on his eighteenth birthday, that this person had no right to vote earlier in the day.  Cf. U.S. Const. amend. XXVI, § 1 (guaranteeing the "right of citizens of the United States, who are eighteen years of age or older, to vote").  And yet the majority finds § 1432(a) susceptible to just such an unreasonable reading, contrary to any principle of statutory construction of which I am aware and, indeed, to common sense.

Relying principally on dicta from an 1881 Supreme Court opinion that did not involve age but rather the question of when a law should be deemed enacted, see Louisville v. Sav. Bank, 104 U.S. 469, 478 (1881), the majority does not attempt to limit its reasoning to the construction of statutes relating to citizenship,

nor could it do so plausibly. As the majority writes, we may "parse the day into hours," in spite of clear and unambiguous statutory language suggesting we may not, whenever it is "important to the ends of justice." Maj. Op. at 12 (emphasis added).[13] The "ends of justice" is a malleable standard at best, and one that a court is not empowered to employ to displace clear and unambiguous statutory language. Today the majority invokes this standard because "citizenship is at stake," id., but the majority's methodology simply cannot be limited to that context. Why shouldn't a statute conferring exclusive jurisdiction on a juvenile court over all persons whose offenses were committed when they were "under eighteen years of age" be construed to cover a defendant who

---

[13] The majority seeks support from the fact that bankruptcy courts "have long considered fractions of days to determine certain rights," Maj. Op. at 11, but the cases on which it relies are simply inapt. Bankruptcy courts parse the day into hours because they are applying provisions of the Bankruptcy Code that hinge legal consequences on the order in which specified events occur — whether, for instance, an expense is incurred before or after the commencement of a case — and these provisions require the bankruptcy court to determine the order. See, e.g., Vanco Trading, Inc. v. Monheit (In re K Chem. Corp.), 188 B.R. 89, 94–96 (Bankr. D. Conn. 1995), cited in Maj. Op. at 11 n.3 (adopting a "fractionalization" approach to conclude that a debt incurred by the debtor on the same day that its petition was filed but before the exact time of filing was not an administrative expense afforded priority under 11 U.S.C. § 503(b)(1)(A), because by the terms of the Code such expenses must have been incurred "after the commencement of the case," id. at 94 (quoting § 503(b)(1)(A))). These provisions are very different from statutes such as § 1432(a) that clearly and unambiguously set forth age distinctions using commonly employed phrases.

- 11 -

committed criminal acts prior to his exact birth hour on his birthday?  See, e.g., Yarger, 908 N.E.2d at 463.  After all, prosecution as an adult can have "harsh consequences," Ex Parte Petty, 548 So. 2d 636, 636 (Ala. 1989) (quoting Baldwin v. State, 456 So. 2d 117, 123 (Ala. Crim. App. 1983)), so perhaps the "ends of justice" might favor parsing out the day into hours in such a case.   But  perhaps,  on  the  other  hand,  the  defendant's circumstances and the heinousness of the crime suggest he should face responsibility for his acts as an adult, so parsing would not serve the "ends of justice."  The result is unknowable applying the majority's standard, a state of affairs that the clear language of § 1432(a) and the many other statutes using this or similar phrasing cannot support.[14]

The majority's only response to these arguments is that the commonly understood meaning of "under the age of eighteen" is a "linguistic imprecision" and "rule of convenience" that should not be followed in this case. Maj. Op. at 12-13.  This is so, suggests the majority, because while in most contexts it makes no difference precisely when one reaches the "age of eighteen," in this case it

---

[14] The majority thus misses the point of my argument.  I do not contend that courts will be unable to apply the majority's chosen "standard," but that the language of § 1432(a) cannot reasonably be interpreted to permit courts to engage in the indeterminate inquiry the majority undertakes.  Contra Maj. Op. at 13.

does.  Id. at 12.  But I know of no principle of statutory construction suggesting that we may depart from the common understanding of statutory terms — statutory terms that are clear and unambiguous — simply because we are confronted with a case in which we believe it is important to do so.  Respectfully, to apply such a principle, as the majority does, is not an act of statutory construction but judicial draftsmanship.  And it flies in the face of the Supreme Court's admonition that "[a]n alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress.  Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare."  INS v. Pangilinan, 486 U.S. 875, 884 (1988) (quoting United States v. Ginsberg, 243 U.S. 472, 474 (1917)) (internal quotation marks omitted).

Even if I were to indulge the majority's view that § 1432(a) is susceptible to two readings — and it is not — consideration of the provision in light of related sections of the Immigration and Nationality Act ("INA") clearly shows that the majority has rejected the correct reading.  Prior to 1952, under the Nationality Act of 1940, a child born outside of the United States to alien parents acquired citizenship derivatively if the child's parents (or a single parent if the other parent was deceased or did not

- 13 -

have custody of the child following a separation) were naturalized "while such child [was] under the age of eighteen years." Nationality Act of 1940, Pub. L. No. 76-853, § 314, 54 Stat. 1137, 1145-46. In 1952, Congress repealed the relevant portions of the Nationality Act and enacted a new version of the derivative citizenship statute which lowered the relevant age to sixteen years. See Immigration and Nationality Act, Pub. L. No. 82-414, § 321(a), 66 Stat. 163, 245 (1952) ("A child born outside of the United States of alien parents . . . becomes a citizen . . . upon the fulfillment of [various conditions, including the naturalization of the relevant parent] while such child is under the age of sixteen years . . . ."). As we noted in Langhorne v. Ashcroft, 377 F.3d 175 (2d Cir. 2004), the change created a gap between the age at which a person could acquire citizenship derivatively and the age at which a person could apply for citizenship on his own:

> Significantly, Section 321(a) [§ 1432(a)] reduced the age at which a child could acquire derivative citizenship from eighteen (under the 1940 Act) to sixteen. . . . This change was problematic, however, for the reason noted by the Attorney General in a 1978 letter to the Chair of the House Judiciary Committee:

>> Currently, a person is not eligible to file a petition for naturalization in his own behalf under [8 U.S.C. § 1445] until reaching the age of 18. Thus, there is a 2-year period during which a child is not able to derive citizenship by reason of his parents' naturalization, but is not able to file his

- 14 -

> own petition for naturalization either. The
> only procedure available during this period is
> for the parent or parents to file a formal
> petition for the child's naturalization . . .
> . This procedure is both cumbersome and
> unnecessary. Young people between the age of
> 16 and 18 should be able to derive citizenship
> automatically . . . .

> H.R. Rep. No. 95-1301, reprinted in 1978 U.S.C.C.A.N.
> 2301, 2309-10. Evidently to meet this concern and
> correct an unintended consequence of the 1952
> formulation, a 1978 amendment changed the age requirement
> in Section 321(a) from sixteen to eighteen. Act of Oct.
> 5, 1978, Pub. L. 95-417, §§ 4-5, 92 Stat. 917.

Langhorne, 377 F.3d at 181 (citations and alterations omitted).

Thus, the majority is correct that Congress amended the 1952 version of the derivative citizenship statute in 1978, enacting the version at issue here, with the "underlying intention" of allowing children to acquire citizenship derivatively from their parents, and thereby keep together the family unit. Maj. Op. at 14. But it did so only to ensure that children might acquire derivative citizenship until they were of the age at which they could file petitions on their own behalf. See 8 U.S.C. § 1445(b) ("No person shall file a valid application for naturalization unless he shall have attained the age of eighteen years."). Because the natural meaning of the requirement in § 1445(b) that a petitioner must have "attained the age of eighteen years" is that the petitioner must have turned eighteen on the date the petition is filed, cf. Commonwealth v. A Juvenile, 545 N.E.2d 1164, 1164-65 & n.2 (Mass.

1989) (construing statute referring to "children who attain their seventeenth birthday" as covering one who "attains the age of seventeen"), it stands to reason that the language "under the age of eighteen years" in §1432(a) should be construed as going up to the day before a petitioner's rights under § 1445(b) to file a petition on his own behalf attach.

One wonders how the majority would interpret § 1445(b) in light of its holding today. Both § 1445(b) and § 1432(a) turn on when the person in question becomes eighteen years old. Cf. Langhorne, 377 F.3d at 181 ("[T]he overarching statutory scheme that was in place . . . was clearly keyed to the age of eighteen."). If the derivative citizenship statute means that Duarte was still "under the age of eighteen" until the evening of June 14, 1991, presumably he had not "attained the age of eighteen" until that time. Thus, if the majority stands by its methodology, it must conclude that had Duarte attempted to file a petition for naturalization on his own behalf on June 14, 1991, he should have been turned away under § 1445(b) until after the hour on which he was born. With respect, this is what comes from using isolated fragments of legislative history to vary the clear meaning of an unambiguous statute. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other

- 16 -

extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." (emphasis added)).

The majority next purports to find support in the supposed difference between § 1432(a) and statutes that refer specifically to "birthdays," such as 18 U.S.C. § 5031, setting forth the federal definition of a juvenile. Maj. Op. at 14-16. See 18 U.S.C. § 5031 ("[A] 'juvenile' is a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday . . . ."). This support, however, is anything but substantial. For the reasons discussed above, any reasonable reader, keeping in mind the statutes' contexts and Congress's evident purpose to draw a useable age division line, would read the phrases "under the age of eighteen years" in § 1432(a) and "has not attained his eighteenth birthday" in § 5031 to be equivalent. And that, in fact, is precisely what courts have done. See, e.g., United States v. Ramirez, 297 F.3d 185, 190-91 (2d Cir. 2002) (construing § 5031 to mean that the defendant must be "under twenty-one at the time the juvenile information charging the crime is filed" (emphasis added)); United States v. Pool, 937 F.2d 1528, 1532 (10th Cir.

1991) ("Federal law defines a juvenile as being under the age of 18
. . . .").

The majority suggests that Congress's selection of the "birthday" language in § 5031 was a deliberate attempt to avoid the supposed ambiguity that exists in § 1432(a). Maj. Op. at 15-16. But the only ambiguity that Congress sought to avoid in the federal definition of a juvenile concerned the question whether "a person seventeen years of age or under," which is how the former definition read, see Act of June 16, 1938, ch. 486, 52 Stat. 764, included those persons between their seventeenth and eighteenth birthdays, or only those persons who had just turned seventeen years of age.[15] Courts have taken and continue to take divergent

---

[15] The historical notes to § 5031 indicate that the "birthday" language was adopted after U.S. District Judge Arthur J. Tuttle wrote to Congress stressing "the necessity of a definite fixing of the age of the juvenile." 18 U.S.C. § 5031 (Notes to 1948 Acts); see also Maj. Op. at 15. Judge Tuttle's letter reveals that the ambiguity in the former version of the juvenile definition resided in the phrase "seventeen years of age or under," which left uncertain the status of those persons who had passed their seventeenth birthday but not yet reached their eighteenth. "Some people will read [the phrase] and say that he ceases to be a juvenile just as soon as the hands of the clock pass midnight on the midnight which ends his seventeenth birthday. Others read it and say, 'No, it is a year later. He continues to be a juvenile until midnight before his eighteenth birthday.'" Letter from Arthur J. Tuttle to Eugene J. Keogh, Chairman, Committee on Revision of the Laws, U.S. House of Representatives (June 24, 1944) (on file in Arthur J. Tuttle Papers, Bentley Historical Library, University of Michigan). There is no indication in Judge Tuttle's letter that he found ambiguity in the former version of the juvenile statute as it would apply to those "under" the age of seventeen.

views on this question: "Some courts have found that a clause specifying a particular age 'or under' applies to the full year of the stated age. . . . Other courts have reached a contrary interpretation," that one past, for instance, his sixteenth birthday is no longer "a child of the age of sixteen years, or under." State v. Munoz, 228 P.3d 138, 140 (Ariz. Ct. App. 2010) (internal quotation marks omitted); see also State v. Shabazz, 622 A.2d 914, 918 (N.J. Super. Ct. App. Div. 1993) (collecting cases). But this is ambiguity in what it means to be sixteen, seventeen, or some other age, not in what it means to be "under" a given age. Both sides of this debate agree that the "or under" language is not ambiguous: it refers to a person before he reaches his birthday and turns a year older. See, e.g., Munoz, 228 P.3d at 140 n.3 ("Undoubtedly, Arizona's legislature could have expressed its intent for the cutoff age more precisely by saying 'under fifteen' or 'under sixteen.' Instead, the legislature used the language 'fifteen years of age or under' . . . ."); id. at 142 ("We assume the [legislature] intended to change the intended cutoff age when it voted to approve the amendment to the bill from 'under the age of fifteen' to 'a child the age of fifteen years or under.' Had the legislature intended to protect only children less than fifteen years of age, it would have left the proposed wording intact, as the unmodified version clearly did not apply to any child who had

reached his fifteenth birthday." (citation omitted)); State v. Carlson, 394 N.W.2d 669, 673 (Neb. 1986) ("If 'less than fourteen years of age' or 'under fourteen years of age' had been used in [a Nebraska sexual assault statute], the protection of that statute would terminate when a child reached the 14th birthday.").

The majority also seeks support for its construction of § 1432(a) in Matter of L — M — and C — Y — C —, 4 I. & N. Dec. 617 (B.I.A. 1952), a BIA decision never before cited by any federal court or even relied on by the BIA itself in any of its own subsequent cases. Maj. Op. at 16-17. The case involved a wholly different statutory scheme. In L — M —, the statute at issue provided that the foreign-born child of a U.S. citizen was a citizen himself at birth, but that citizenship was lost if the child "ha[d] not taken up a residence in the United States or its outlying possessions by the time he reache[d] the age of 16 years . . . ." L — M —, 4 I. & N. Dec. at 618 (quoting Nationality Act of 1940, supra, § 201(g), 54 Stat. at 1139). Thus the question was whether the petitioners, who were citizens of the United States, were divested of that citizenship or whether they had complied with this statutory "return requirement." Granted, the BIA rejected what was perhaps the more natural reading of the statute in favor of a reading that comported with Congress's apparent intent that the statute be applied only to those who "by their own acts, or

inaction, show that their real attachment is to the foreign country [in which they previously had been living] and not to the United States." Id. at 619.[16] Thus the petitioners, who clearly evinced a continued "attachment" to the United States by seeking to return and arriving on their sixteenth birthdays, were not excluded. But this outcome was consistent with other BIA cases, construing the same or similar provisions, concluding that a citizen child would not be divested of citizenship even when he did not return but rather "when [he only] proceeded with due diligence to comply but his compliance with the physical presence requirement [was] prevented by official error or inaction." 7 Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, Immigration Law and Procedure § 93.02(6)(d) (Matthew Bender, Rev. Ed. 2010); see also id. nn. 148-50 (citing cases). Significantly, moreover, the BIA has never extended this reasoning to statutes governing the creation of citizenship. Indeed, L — M — took pains to stress that

---

[16] The BIA did not, as the majority suggests, hold that "the method of arriving at the computation is to be in the interest of the person affected by it" when considering citizenship claims. Maj. Op. at 16 (quoting L — M —, 4 I. & N. Dec. at 620). The BIA made this statement only in describing the reasoning of a different case, In re Babjak, 211 F. 551 (W.D. Pa. 1914), which involved a question entirely different from the one presented here: when a statute required a citizenship petition to be filed "no[] more than 7 years" after the applicant "ha[d] made [a] declaration of intention," and the applicant filed his petition seven years to the day after his declaration, whether the court had jurisdiction to consider the petition. Babjak, 211 F. at 552.

the statutory return requirement was a "condition[] subsequent and not [a] condition[] precedent" to citizenship, L — M —, 4 I. & N. Dec. at 618 (emphasis added), and that "a distinction should be made between the computation of the time within which a right may begin and the computation of the time within which a right shall end," id. at 620. There is a good reason here for drawing such a distinction: one who is divested of citizenship loses the privilege, but one who does not meet the qualifications for acquiring citizenship derivatively merely has to apply on his own behalf.[17]

The majority's remaining arguments in favor of its

_____

[17] To the extent the majority suggests we must defer to the BIA's interpretation of the statute at issue in L — M —, see Maj. Op. at 10 n.2, it is incorrect. As explained, L— M — dealt with a different statute in a different context. Further, to the extent L — M — could be read to bear on the question before us, the BIA has clearly changed its view since 1952. See Matter of Baires-Larios, 24 I. & N. Dec. 467, 468 (B.I.A. 2008) ("We agree with the respondent that she has met the requirements of section 321(a) of the Act if she came into her father's legal custody prior to reaching her 18th birthday . . . ."); 8 Gordon, Mailman, and Yale-Loehr, supra, § 98.03(3)(e) ("The administrative view is that in computing the child's age for derivative citizenship purposes under the applicable statute, the designated age of maturity will be attained at 12:01 A.M. on the applicable anniversary day of the child's birth." (citing INS Interpretations 320.2)). In any event, the Chevron deference question is, for me, ultimately not relevant because the language of § 1432(a) is sufficiently clear that Congress can be considered to have "directly spoken to the precise question at issue," Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842 (1984); see also Langhorne, 377 F.3d at 179, 181 — the "precise question" being what age a person must be to acquire citizenship derivatively.

interpretation merit little discussion. Because we are interpreting a statute, this case does not involve the "legal fiction" that "a day is indivisible," Maj. Op. at 11, except to the extent that this "fiction" reflects our ordinary understanding of when a person is "over" or "under" a certain age. And we must presume, unless it has given us reason to think otherwise, that Congress intends the ordinary meaning of words when it uses those words in statutes. See, e.g., Mitsui & Co. v. Am. Exp. Lines, Inc., 636 F.2d 807, 814 (2d Cir. 1981). Because it was also the rule at common law that the law will not recognize fractions of a day, see, e.g., Parker v. State, 484 A.2d 1020, 1021-22 (Md. Ct. Spec. App. 1984), we must also presume that Congress legislated "against [the] background of [that] common-law principle[]," Samantar v. Yousuf, 130 S. Ct. 2278, 2289 n.13 (2010) (internal quotation marks and alteration omitted). Nothing in the derivative citizenship statute rebuts these presumptions.

Finally, even if § 1432(a) contained an ambiguity — which it does not — the majority ignores the principle of statutory construction that "an ambiguous statute must be construed to avoid absurd results." Rotimi v. Holder, 577 F.3d 133, 142 (2d Cir. 2009) (per curiam) (quoting Troll Co. v. Uneeda Doll Co., 483 F.3d 150, 160 (2d Cir. 2007)) (internal quotation marks omitted). The majority's reading of the text is not only implausible in and of

itself but also leads to absurdity — for it would be clearly unreasonable to require courts to ascertain the precise minute and hour of relevant events when applying statutes that include age distinctions:

> If we were to hold that a juvenile becomes an adult at the precise hour of his or her birth . . . not only would it be necessary for the state to prove the precise hour, minute, and second of the alleged offense, but the state would also have to prove the precise hour, minute, and second of the individual's birth.  In addition, courts would be required to deal with other peripheral issues, such as different time zones across the United States, or even across the world, and the inconsistent use of daylight-savings time.  While . . . these issues are not completely impossible to remedy, they seem unreasonable or absurd when compared to the practical and commonly practiced solution of treating a person as a year older at 12:01 a.m. local time on their birthday.

Yarger, 908 N.E.2d at 468-69.  Yet again, if the statute here truly were susceptible to multiple meanings, as the majority thinks, the decision which to apply is perfectly clear.

***

Our power to grant citizenship is limited; it is "a specific function to be performed in strict compliance with the terms of an authorizing statute which says that 'a person may be naturalized in the manner and under the conditions prescribed in this subchapter [including former § 1432(a)], and not otherwise."  Pangilinan, 486 U.S. at 884 (alterations omitted) (quoting 8 U.S.C. § 1421(d)). We may not circumvent this principle, as the majority does, by implausibly construing those clear and unambiguous statutory

- 24 -

requirements.  I respectfully dissent.