16-3480-ag
Khalid v. Sessions

# In the
# United States Court of Appeals
## For the Second Circuit

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

August Term, 2017
No. 16-3480-ag

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

MOHAMMED HASSAN FAIZAN KHALID,
*Petitioner*,

*v.*

JEFFERSON B. SESSIONS III, United States Attorney General,
*Respondent.*[*]

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

ARGUED: JANUARY 11, 2018
DECIDED: SEPTEMBER 13, 2018

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Before: JACOBS, HALL, and DRONEY, *Circuit Judges*

Petitioner Mohammed Hassan Faizan Khalid petitions for review of a September 14, 2016, decision of the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ) order of removal. The Department of Homeland Security instituted removal

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

proceedings against Khalid after he was convicted of conspiring to provide material support for terrorism in violation of 18 U.S.C. § 2339A. Khalid moved to terminate his removal proceedings, contending that he derivatively acquired citizenship from his U.S. citizen father. At the time Khalid's father became a U.S. citizen, Khalid had recently entered federal pretrial juvenile detention for terrorism-related charges, and remained there for the short time until his eighteenth birthday. As a result, the IJ and BIA concluded that Khalid was not in the "physical custody" of his U.S. citizen parent before his eighteenth birthday, as required by the applicable derivative naturalization statute, 8 U.S.C. § 1431(a). We hold that the short, temporary physical separation caused by Khalid's time in federal pretrial juvenile detention did not strip Khalid's father of his "physical custody" of Khalid as that term is used in 8 U.S.C. § 1431(a), and that consequently, Khalid is a U.S. citizen. Accordingly, we **GRANT** the petition for review, **VACATE** the BIA's decision, and **REMAND** with instructions to terminate Khalid's removal proceedings.

Judge Jacobs, *Circuit Judge*, with whom Judge Hall joins, concurs in a separate opinion.

WAYNE SACHS, Sachs Law Group, LLC, Philadelphia, PA, *for Petitioner*.

PAUL F. STONE, Senior Counsel for National Security, Office of Immigration Litigation (Chad A. Readler, Acting Assistant Attorney General, Civil Division, Ethan B. Kanter, Deputy Chief, National

Security Unit, Office of Immigration Litigation, *on the brief*), U.S. Department of Justice, Washington, D.C., *for Respondent*.

Andrew Wachtenheim, Immigrant Defense Project, New York, NY, *for Amici Curiae* Center for Family Representation, Her Justice, Sanctuary for Families, The Door's Legal Services Center, Columbia Law School Immigrants' Rights Clinic, New York University School of Law, Immigrant Rights Clinic, Kathryn O. Greenberg Immigration Justice Clinic at Benjamin N. Cardozo School of Law, Brooklyn Defender Services, Monroe County Public Defender's Office, Neighborhood Defender Service of Harlem, New York County Defender Services, The Bronx Defenders, Legal Aid Society, Center for Constitutional Rights, Inc., Immigrant Defense Project, and Professors Chris Gottlieb, Kim Taylor-Thompson, Martin Guggenheim, Michael Wishnie, Randy Hertz, and Tony Thompson, *in support of Petitioner*.

DRONEY, *Circuit Judge*:

Under the Immigration and Nationality Act (INA), a child under the age of eighteen who is a legal permanent resident (LPR) of the United States acquires citizenship when that child's parent becomes a U.S. citizen if the child is residing in the United States in the "legal and physical custody" of the citizen parent. 8 U.S.C. § 1431(a). In this petition, we are asked to construe the term "physical custody" in 8 U.S.C. § 1431(a) as it applies to the unique situation presented here.

In July 2011, the FBI arrested Petitioner Mohammed Hassan Faizan Khalid for allegedly conspiring to provide material support for terrorism in violation of 18 U.S.C. § 2339A. At the time, Khalid was a minor and a legal permanent resident of the United States. The United States District Court for the Eastern District of Pennsylvania placed Khalid in pretrial juvenile detention following his arrest. Shortly thereafter, in August 2011, Khalid's father became a U.S.

4

citizen, while Khalid was still under the age of eighteen. A month later, Khalid turned eighteen while still in federal pretrial juvenile detention. During Khalid's subsequent removal proceedings, the IJ and the BIA concluded that Khalid's detention had terminated his father's "physical custody" over Khalid, and therefore Khalid was not eligible to acquire derivative citizenship under 8 U.S.C. § 1431(a).

We disagree and hold that Khalid's temporary physical separation from his father while in federal pretrial juvenile detention did not terminate Khalid's father's "physical custody" of Khalid. We construe the term "physical custody" in 8 U.S.C. § 1431 by first looking to state law definitions of that term. Those definitions provide some direction and indicate that a parent's physical custody of a child does not cease due to a child's brief, temporary separation from a parent. Second, the statutory context and history of the derivative citizenship statute indicate that the "physical custody" requirement ensures that the LPR child has a strong connection to the naturalizing

5

parent and to the United States at the time the child becomes eligible for derivative citizenship. Khalid had those connections. Third, the applicable canons of statutory interpretation also favor construing the term "physical custody" so that such custody does not terminate upon a brief, temporary separation from a parent. Finally, the distinctive nature of federal pretrial juvenile detention—which encourages continued family involvement with the child during such detention—further supports the conclusion that Khalid's father retained "physical custody" over Khalid for the purposes of 8 U.S.C. § 1431(a). As a result, Khalid is a U.S. citizen and the Department of Homeland Security (DHS) must terminate removal proceedings against him.

## BACKGROUND

Petitioner Mohammed Hassan Faizan Khalid entered the United States with his family as an LPR in 2007. He was born in the United Arab Emirates, but as the child of two Pakistani parents, he

6

was a Pakistani citizen. From at least the summer of 2009, when he was 15 years old, until his arrest in July 2011 at age 17, Khalid used the internet to attempt to assist extremists in the United States and abroad. According to the government, Khalid helped with recruitment efforts by translating jihadist videos from Urdu into English, and then posting those videos online. In addition, Khalid assisted a co-defendant who aspired to commit jihad in Europe by attempting to fundraise for that co-defendant and by concealing evidence from the FBI.

Federal agents arrested Khalid on July 6, 2011. At the time he was arrested, Khalid was seventeen years old, had just graduated from high school, and was living at home with his parents in suburban Baltimore. Following his arrest, Khalid was detained at the Berks County Youth Correctional Center ("Berks") in Berks County, Pennsylvania. Shortly thereafter, a federal district judge ordered

7

Khalid's continuing detention at that facility pursuant to 18 U.S.C. §§ 5034–5035, which governs federal pretrial juvenile detention.

A little over a month after his arrest, on August 17, 2011, Khalid's father became a U.S. citizen. At the time Khalid's father naturalized, Khalid was still detained at Berks. The government transferred Khalid to an adult facility that October, after Khalid turned eighteen years old.

Khalid cooperated extensively with the government following his arrest. He met with federal investigators over twenty times and testified in grand jury proceedings for two investigations. The government acknowledged that "Khalid's assistance advanced multiple national security investigations in important ways." AR 538.[1] Khalid pleaded guilty to violating 18 U.S.C. § 2339A, but because of his cooperation, the government requested a downward departure from Khalid's recommended Guidelines sentence of fifteen years'

---

[1] We use "AR" as shorthand for the administrative record.

8

imprisonment. The district court sentenced Khalid to five years' imprisonment, which he has served.[2]

In late 2015, after Khalid served his sentence, the government transferred him to the custody of Immigration and Customs Enforcement, and the DHS commenced removal proceedings against Khalid based upon his conviction. Khalid moved to terminate the removal proceedings on the ground that he is a U.S. citizen by virtue of his father's naturalization, *see* 8 U.S.C. § 1431(a), and, in the alternative, sought deferral of removal under the Convention Against Torture, *see* 8 C.F.R. § 1208.17(a).[3] The IJ denied the motion to terminate in April 2016, concluding that Khalid was not in his father's "physical custody" at the time his father naturalized. In September

---

[2] At oral argument, counsel for the government indicated that he had no information indicating that Khalid presents a continuing threat to the United States.

[3] DHS sought removal to the United Arab Emirates or Pakistan. Khalid maintained that he would be tortured if removed to Pakistan because of his cooperation in the federal terrorism investigations.

9

2016, the BIA affirmed the IJ's decision, holding that a "child must reside with the citizen parent to satisfy the 'physical custody' requirement of [8 U.S.C. § 1431(a)(3)]." AR 6. Khalid now petitions for review of the BIA's decision, arguing that DHS may not remove him because he is a U.S. citizen.[4]

**DISCUSSION**

**I.    Jurisdiction and Standard of Review**

Khalid presents one question for review: whether he was in the "physical custody" of his father under 8 U.S.C. § 1431(a) at the time his father naturalized. That issue is a question of law that we have jurisdiction to review. 8 U.S.C. § 1252(a)(2)(D); *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 326–28 (2d Cir. 2006). In addition, we have jurisdiction pursuant to 8 U.S.C. § 1252(b)(5)(A) because Khalid claims that he is a United States citizen and no dispute of fact prevents

---

[4] The IJ also granted Khalid deferral of removal as to Pakistan, but not as to the United Arab Emirates.

our resolution of that question. We review *de novo* the BIA's interpretation of a citizenship statute. *See Jaen v. Sessions*, 899 F.3d 182, 185-86 n.2 (2d Cir. 2018).

**II.     The Text, Context, and Statutory History of 8 U.S.C. § 1431(a)**

To determine whether Khalid satisfies the "physical custody" requirement in this context, we first look to the text of the statute. *See, e.g., Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 739 (2017). If the statute is ambiguous, then "we may resort to canons of statutory interpretation to resolve the ambiguity." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018). We determine whether a statute is ambiguous "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Here, we begin that inquiry by first examining the text of the statute itself, and, concluding that the term "physical custody" is not entirely clear, we then turn to the broader statutory context and its history.

11

a. *"Physical Custody"* and State Law Guidance

Under 8 U.S.C. § 1431, a child may derive U.S. citizenship from a parent if (1) one parent is a citizen, (2) the child is "under the age of eighteen years," and (3) "[t]he child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence." 8 U.S.C. § 1431(a).[5] Neither party here disputes that the statute uses the term "physical custody" in the family law sense of the term.[6] Nevertheless, the government suggests that we should only interpret this term with reference to federal law and BIA precedents interpreting terms other than "physical custody." We agree with the government that "naturalization laws must 'be construed according to a federal, rather than state, standard.'" *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir.

---

[5] There is no dispute that Khalid's father and mother shared legal custody of Khalid at all relevant times, and that both parents were living together with Khalid and his siblings in Maryland until Khalid's arrest.

[6] The parties also do not dispute that Khalid satisfies the remaining requirements for citizenship.

2004) (quoting *Nehme v. INS*, 252 F.3d 415, 422–23 (5th Cir. 2001)). However, "[i]t is [also] a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 287 (2d Cir. 2015) (quoting *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014)).

In this case, that "cardinal rule" compels us to examine state law definitions of "physical custody" to help construe that term and the "cluster of ideas" attached to it. *Id.* Family law, after all, is an area of law that federal courts and Congress leave almost exclusively to state law and state courts. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 310 (1993) (noting that states have "special proficiency in the field of domestic relations, including child custody" (internal quotation marks omitted)); *Ankenbrandt v. Richards*, 504 U.S. 689, 701–04 (1992) (discussing domestic relations exception to federal diversity

13

jurisdiction for cases involving divorce, alimony, and child custody decrees). This approach to statutory interpretation of such a term is well-grounded in our precedent and that of the Supreme Court. For example, we have looked to state law definitions to define the term "legal custody" in the prior version of the derivative citizenship statute at issue in this case. *See Garcia v. USICE (Dep't of Homeland Sec.)*, 669 F.3d 91, 95 (2d Cir. 2011). Indeed, we observed in *Garcia* that "we often look to state law for a rule of decision where there is no extant body of federal common law in the area of law implicated by the statute." *Id.* (alterations and internal quotation marks omitted); *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) ("That we are dealing with a uniform federal rather than a state definition does not, of course, prevent us from drawing on general state-law principles to determine the ordinary meaning of the words used." (internal quotation marks omitted)).

Consistent with these principles, we turn to state law definitions of "physical custody" in the family law context to help us understand how Congress intended to use that term in 8 U.S.C. § 1431.

The parties disagree about the guidance that state law offers. The government, consistent with the BIA, contends that a child must be "actually resid[ing]" with the citizen parent at the exact time of the parent's naturalization or before the child's eighteenth birthday to satisfy this requirement. Resp't Br. 19–20. In contrast, Khalid argues that "physical custody" describes only the "legal relationship between parents and minor" children. Pet'r Br. 10. Both arguments find some support in state law, and as a result, we do not find state law conclusive in defining that term.

State family law definitions of the term "physical custody" are often at odds with the government's assertion that a child must be "actually resid[ing]" with a parent for the child to be in that parent's

15

"physical custody." For example, physical custody can be split between parents, and two parents can share and retain "physical custody" even if the child does not actually reside in any one parent's home full-time. *See, e.g.*, *Loran v. Loran*, 2015 WY 24, ¶ 17 n.3, 343 P.3d 400, 404 n.3 (Wyo. 2015) (listing cases addressing shared physical custody in Wyoming); *Jarvis v. Jarvis*, 1998 ND 163, ¶¶ 34–37, 584 N.W.2d 84, 92 (discussing split physical custody arrangements); Child Custody Prac. & Proc. § 4:34 ("When choosing between parents, the court may award sole or exclusive custody to one parent, joint legal and/or physical custody, or divided custody with each parent having physical custody of one or more children."). Those uses of the term "physical custody" conflict with the government's argument that Khalid must have been "actually residing" with his father at the time he naturalized or before the short time until his eighteenth birthday to obtain derivative citizenship.

Further, Khalid is correct that the term "physical custody" is often used to define a legal relationship between the child and parent. Indeed, in the state where Khalid lived with his family prior to his detention and conviction, "[p]hysical custody . . . means the *right* and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody." *Taylor v. Taylor*, 508 A.2d 964, 967 (Md. 1986) (emphasis added); *see also Henderson v. Henderson*, 568 P.2d 177, 179 (Mont. 1977) ("'Physical custody' is not limited to having actual, immediate control of the physical presence of the child. Rather, this phrase relates to the custodial rights involved in the care and control of the child."). Similarly, state courts also employ the term "physical custody" to describe a right that they "award" to parents disputing who may control a child's decisions and provide care to that child. *See, e.g., Nolte v. Mehrens*, 648 N.W.2d 727, 731 (Minn. 2002) (explaining requirements for "award[ing] physical custody"); Child

17

Custody Prac. & Proc. § 4:34; Custody; *Black's Law Dictionary* (10th ed. 2014) (defining custody as "[t]he care, control, and maintenance of a child awarded by a court to a responsible adult," and stating that "[c]ustody involves legal custody (decision-making authority) and physical custody (caregiving authority), and award of custody grants both rights").

As we noted, the BIA's decision in this matter interprets "physical custody" to require that Khalid have "actually resided" with his father in the two-month window between his father's naturalization and Khalid's eighteenth birthday. The government does have some support for this position. For example, the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) defines "physical custody" as "the physical care and supervision of a child." UCCJEA § 102(14). That definition seems to require a parent's physical presence with the child. In addition, state courts do sometimes deem residing with a parent a component of "physical

18

custody." *See, e.g.*, *In re AJR*, 852 N.W.2d 760, 765 (Mich. 2014) (noting that "physical custody pertains to where the child shall physically reside" in interpreting Michigan's child custody laws (alteration omitted) (internal quotation marks omitted)); *Rivero v. Rivero*, 216 P.3d 213, 222 (Nev. 2009) ("Physical custody involves the time that a child physically spends in the care of a parent. During this time, the child resides with the parent and that parent provides supervision for the child and makes the day-to-day decisions regarding the child.").

On balance, the state law uses of the term "physical custody" are inconclusive in defining that term in 8 U.S.C. § 1431(a). However, we emphasize that many of the state law uses of the term "physical custody" conflict with the BIA's requirement that a "child must reside with the citizen parent to satisfy the 'physical custody' requirement of [8 U.S.C. § 1431(a)(3)]," as it applied that rule in this case. AR 6. The BIA's decision reduces "physical custody" to an "actual residency" requirement at some point after the citizen parent naturalizes, but

before the child's eighteenth birthday—even in cases involving short, temporary separations, like this one. State law rarely uses such a narrow definition of physical custody, and we do not think that "physical custody" is determined exclusively by the small moment in time immediately following a citizen parent's naturalization, even when looking to state law for guidance. However, given the variety of definitions under state law, we conclude that the plain text itself does not clarify what constitutes "physical custody" under 8 U.S.C. § 1431. Accordingly, we turn to other indicators of the statute's meaning to help construe and apply that term in this case.[7] *See, e.g.,*

---

[7] The government also argues that "in the legal and physical custody of the citizen parent" is a "limiting phrase" that "grammatically must refer" to the antecedent "the child is residing" in § 1431(a)(3). Resp't Br. 26. While this may be true, "physical custody" is a term of art, and the state law definitions we surveyed above make clear that in some contexts, a parent might "have" physical custody or a child might be residing "in" a parent's physical custody, even if that child is not currently physically present with the parent. Such "ordinary meaning[s]" of "physical custody" do not limit the statute in the way the government argues. *Holyfield*, 490 U.S. at 47. As a result, we do not think the government's grammatical argument affects the outcome of this petition. A term of art does not lose its meaning simply because of the verb that it modifies.

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893–94 (2018) (looking first to the words of the text, and then to the broader "statutory structure" to interpret a term in the Bankruptcy Code); *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]e must read the words [of a statute] in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).

   b. *The Statutory Context and History*

   Congress enacted the current version of the derivative citizenship statute with the passage of the Child Citizenship Act of 2000 ("CCA"). *See* Child Citizenship Act of 2000, Pub. L. 106-395, 114 Stat. 1631 (2000) (codified in part at 8 U.S.C. § 1431). That Act significantly amended the derivative citizenship statute by "liberaliz[ing] the Immigration and Nationality Act's conditions for the automatic derivative naturalization of alien children of United States-born or naturalized parents." *Drakes v. Ashcroft*, 323 F.3d 189, 190 (2d Cir. 2003) (per curiam). In particular, and as relevant here, the

21

statute modified the derivative citizenship conditions for LPR children with married LPR parents, making it easier for those children to obtain citizenship when a parent naturalizes. The new "physical custody" requirement ensures that a child's "real interests" are in the United States when obtaining derivative citizenship because the child has a strong connection to the naturalizing parent. *Duarte-Ceri v. Holder*, 630 F.3d 83, 90 (2d Cir. 2010) (quoting *Bustamante–Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006)).  In other words, Congress sought to make derivative citizenship more available to the children of married parents, while still ensuring a connection between the naturalizing parent and child.

As we detail below, those changes to the statute further support our conclusion that Khalid satisfies the "physical custody" requirement of 8 U.S.C. § 1431 in this case. To explain this understanding, we look first at the immediate changes that the CCA brought to derivative citizenship, and second, we examine the

broader statutory context and history of derivative citizenship for minor children.

The CCA made it easier for LPR children to obtain derivative citizenship by requiring that only one of their parents naturalizes. As the House Committee on the Judiciary Report for the CCA notes, under the relevant prior derivative citizenship law, a foreign-born child with non-citizen parents could only become a citizen (1) when "both parents naturalize" or (2) where the parents had divorced or separated and the U.S. citizen parent had custody of the child. *See* H.R. Rep. No. 106-852, at 4 (2000); *see also* 8 U.S.C. § 1432(a) ("A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions: (1) The naturalization of both parents; or . . . (3) The naturalization of the parent having legal custody of the child where there has been a legal separation of the parents . . . ."), *repealed by* § 103 of the Child Citizenship Act of 2000. The revised derivative naturalization statute

(as amended by the CCA) provides that only one parent needs to become a citizen for the non-citizen child to automatically derive citizenship, as long as the naturalized parent has "legal and physical custody" of the child and the child is residing in the United States. *See* 8 U.S.C. § 1431(a); H.R. Rep. No. 106-852, at 5. That one parent requirement applies regardless of whether the parents are separated, unlike the prior version of the statute. Accordingly, the CCA enabled a child with married parents (who are not separated) to acquire derivative citizenship if only one parent naturalized.

In addition, the prior version of the statute mentioned "custody" only in cases involving separated parents. *See* 8 U.S.C. § 1432(a)(3), *repealed by* § 103 of the Child Citizenship Act of 2000. In such cases, the statute granted citizenship to the child so long as the child was in the "legal custody" of the naturalizing parent. *Id.* A child in the legal custody of the non-naturalizing parent, however, would not acquire citizenship. *Id.*

Congress added the words "physical custody" to the statute for the first time with the CCA. In doing so, Congress imposed a custody requirement for the first time in the context of married parents. When compared against the prior version of the statute, those changes indicate that the new custody provision ensures that the child's "real interests" are in the United States because of the child's strong connection to the naturalizing parent. *Duarte-Ceri*, 630 F.3d at 90. Under the former automatic derivative citizenship statute, ensuring that the child's "real interests" were in the United States through the child's connection to the U.S. citizen parent was less of a concern because the prior version of the statute required that both LPR parents naturalize *or* (if the parents were separated) that the child had a strong connection with the naturalizing parent (through the "legal custody" requirement). Similarly, the CCA now requires that a child's "real interests" are in the United States by ensuring that in cases of married (even if physically separated) parents, the child only acquires

25

citizenship if in the custody of the naturalizing parent. *See* 8 U.S.C. § 1431; *Duarte-Ceri*, 630 F.3d at 90.

That conclusion—that "physical custody" helps ensure that a child's "real interests" are in the United States because of the connection to the U.S. citizen parent—fits within both past BIA precedent and the broader statutory context and history. *See Duarte-Ceri*, 630 F.3d at 90. First, under the prior version of the statute, this Court and the BIA looked to which parent had "actual, uncontested custody," in cases of legally separated parents, because the parent with that actual, uncontested custody was "the parent with 'legal custody' for the purpose of evaluating [a] derivative citizenship claim." *Garcia*, 669 F.3d at 96; *see also Matter of M–*, 3 I. & N. Dec. 850 (BIA 1950) ("[I]n the absence of judicial determination or judicial or statutory grant of custody in the case of legal separation of the parent of a person claiming citizenship under section 314(c) [(8 U.S.C. § 1432(a)'s predecessor)], the parent having actual uncontested custody

26

is to be regarded as having 'legal custody' of the person concerned for the purpose of determining that person's status under section 314(c)."). The effect of this inquiry was to ensure that a child only became a U.S. citizen where the naturalizing parent had a true connection to and control of the child, and to deny the child citizenship if the child had little actual relationship with the naturalizing parent.

Furthermore, the CCA replaced a statute that federal courts had long interpreted as seeking to ensure that children acquiring derivative citizenship have their "real interests" in the United States. *Duarte-Ceri*, 630 F.3d at 90. As the Fifth Circuit has explained, in enacting the precursor to the current CCA, "Congress explicitly required the naturalization of both parents [for the child to naturalize], unless the parents had been legally separated and the parent with legal custody obtained naturalization." *Nehme*, 252 F.3d at 424. The court further noted that "the overall intent behind the

[precursor to the CCA] was to make it more difficult for aliens to obtain United States citizenship. Congress was concerned about the burden on the United States government and its agencies of protecting persons who were only 'nominal' citizens of this country and whose 'real interests,' as demonstrated by their residence abroad, was not in the United States." *Id.* at 424–25 (quoting S. Rep. No. 76–2150, at 4 (1940)); *see also id.* at 425 (discussing other legislative history sources to demonstrate that Congress wished to ensure that those who acquired citizenship from the United State's derivative citizenship laws had a real connection to the United States); H.R. Rep. No. 106-852 at 3 n.1 (reaffirming statute's purpose of ensuring a citizen's connection to the United States and noting that the statute's residency language helps to ensure that that purpose is achieved).

This Court has made the same observation about the precursor to the CCA. *See Duarte-Ceri*, 630 F.3d at 89–90. Indeed, we stated in *Duarte-Ceri* that "Congress enacted the [precursor to the

current] derivative citizenship statute to ensure that 'alien children whose real interests were located in America *with their custodial parent*, and not abroad, should be automatically naturalized.'" *Id.* (emphasis added) (quoting *Bustamante–Barrera*, 447 F.3d at 397). Thus, the history of the derivative citizenship statute supports reading the statute—and the term "physical custody," in particular—to ensure that a child's "real interests" are in the United States through a genuine connection between the United States citizen parent and that parent's child.[8] Nothing in either the CCA's text or history suggests that Congress intended to abandon that requirement in enacting the

---

[8] That the statute also requires the non-citizen child to be residing "in the United States" does not mean the "physical custody" language is superfluous in assuring that the child's "real interests" are in the United States. The requirement that the LPR child be in the *citizen* parent's "physical custody" ensures that in situations where parents might be physically (but not legally) separated, the child develops a lasting connection to the United States. The same cannot be said if the child were in the physical custody of *only* the non-naturalizing LPR parent; in that case, the child might not develop the connection to the United States that the statute seeks to guarantee because that LPR parent might leave the United States with the child at some point after the other LPR parent naturalizes.

CCA. Indeed, the physical custody provision demonstrates a desire to continue ensuring that purpose is met.

As a result, while the statutory context and history does not resolve all the textual ambiguities of the term "physical custody," it does make clear that Congress intended to ensure a child's connection to the naturalizing parent. Here, there is no dispute that Khalid had such a connection to his United States citizen father at the time Khalid's father naturalized. Khalid had lived at home with his parents since entering the United States. Thus, Khalid's acquisition of derivative citizenship does not violate Congress's demand that the child has a strong connection to the United States to acquire derivative citizenship.

III.    **Canons of Statutory Interpretation**

Two canons of statutory interpretation applicable to the CCA also support our conclusion that physical custody under 8 U.S.C. § 1431 does not simply end on a brief, temporary separation from the

naturalizing parent. First, the derivative citizenship statute as amended by the CCA promotes "Congress's remedial purposes" of "keep[ing] families intact." *Duarte-Ceri*, 630 F.3d at 90; *see also Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (discussing "Congress's intent to preserve the family unit and to keep families intact" under the previous version of the derivative citizenship provision at issue in this case). While we previously made that observation about the statute's remedial purpose in connection with 8 U.S.C. § 1432, the same observation applies to the amended statute. As we have already noted, the CCA further "liberalizes the Immigration and Nationality Act's conditions for the automatic derivative naturalization of alien children of United States-born or naturalized parents." *Drakes*, 323 F.3d at 190; *see also Pina v. Mukasey*, 542 F.3d 5, 8 (1st Cir. 2008) (similarly noting the Act's purpose of liberalizing the conditions for derivative citizenship for children of U.S. citizens). Accordingly, nothing about the CCA affects our

observation in *Duarte-Ceri*. Indeed, the statute only further promotes its goal of family unity, even while also continuing to ensure a child's connection to the United States.

Second, there is a "long-standing presumption" that in "the immigration context," we construe "'any lingering ambiguities' in favor of the petitioner." *Duarte-Ceri*, 630 F.3d at 89 (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449 (1987)). The government contends the opposite, arguing that "doubts [about Khalid's eligibility] should be resolved in favor of the United States and against the claimant." *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967) (internal quotation marks omitted). The presumption the government cites, however, applies to *evidentiary* burdens, and does not dictate how we must resolve the "lingering ambiguities" that exist when interpreting a citizenship statute. *See, e.g.*, *Gil v. Sessions*, 851 F.3d 184, 188 (2d Cir. 2017) (citing *Berenyi* to support placing burden on petitioner to establish the factual basis for his citizenship).

32

Those considerations further support our conclusion that Khalid satisfies the physical custody requirement. *Duarte-Ceri* compels us to "interpret the statute's ambiguity with leniency" in a way that "preserves rather than extinguishes citizenship," given both the statute's purpose of maintaining family unity and the "lingering ambiguities" as to the text's meaning. 630 F.3d at 88–90. That principle further supports reading "physical custody" not to hinge on the brief and temporary separation created by Khalid's pretrial detention, when no court had yet adjudicated Khalid guilty of any offense.

**IV. The Circumstances of Khalid's Federal Pretrial Juvenile Detention**

We also must conduct an inquiry into the particular custody arrangement at the time the parent naturalizes and the child becomes eligible for citizenship. The BIA made no such inquiry in this matter. Instead, it reached a broad conclusion, declaring that a child must "actually resid[e]" with the U.S. citizen parent "at the time of the [parent's] naturalization or at some time after he becomes a citizen."

AR 5–6. For the reasons we have already explained, we think this interpretation of the statute incorrect. Furthermore, as we explain below, we think that interpretation at odds with the nature of Khalid's separation from his father in this case.

The nature of federal pretrial juvenile detention supports the view that Khalid satisfied the "physical custody" requirement. Congress created the current pretrial detention system for juveniles when it enacted the Juvenile and Delinquency Prevention Act of 1974 ("JDPA"). *See* Pub. L. No. 93-415, 88 Stat 1109 (1974). As relevant here, the JDPA contains four sections, now codified at 18 U.S.C. §§ 5033–5036. Those sections demonstrate Congress expresses a clear preference for preserving the juvenile's connection to his or her family and the family's continued involvement in the juvenile's life during the period of federal pretrial detention.

First, the JDPA requires federal authorities to immediately notify a child's parents when federal authorities arrest a juvenile. 18

34

U.S.C. § 5033. Following a juvenile's arrest, the "juvenile shall be taken before a magistrate judge forthwith." *Id.* At that hearing, if the juvenile has not already been released, "the magistrate judge *shall release* the juvenile to his parents, guardian, custodian, or other responsible party" unless the judge determines that "the detention of such juvenile is required to secure his timely appearance before the appropriate court or to insure [sic] his safety or that of others." *Id.* § 5034 (emphasis added). In the event the magistrate judge does order the juvenile detained, then section 5035 mandates that "[w]henever possible, detention shall be in a foster home or community based facility located in or near [the juvenile's] home community." *Id.* § 5035.

The structure of the JDPA factors into our conclusion in two significant ways. First, the JDPA expresses a strong preference for continued parental involvement during detention. Congress seems to

have desired continued parental care, even during detention, for a juvenile charged with a federal crime. *See id.* §§ 5033–5035.

Second, as *amici* point out, under circumstances like those in Khalid's case, the government's proposed interpretation of "physical custody" would leave the question of whether a child derives *United States citizenship* entirely to the pretrial detention decision of a magistrate or state court judge. *See* Br. of Amici Curiae Ctr. for Family Representation et al. 7. That approach to deciding a child's "weighty interest in citizenship" would make citizenship a status that is "casually conferred," at odds with Congress's detailed scheme for immigration and naturalization. *Fedorenko v. United States*, 449 U.S. 490, 520 n.3 (1981) (Blackmun, J., concurring in judgment); *see also Arizona v. United States*, 567 U.S. 387, 395 (2012) ("Federal governance of immigration and alien status is extensive and complex."). Moreover, the BIA's approach would seem to make the question of citizenship dependent on factors irrelevant to the child's eligibility for

citizenship. For example, the JDPA allows a magistrate judge to consider whether a child might appear at his or her next court hearing when ordering detention. 18 U.S.C. § 5034. Many state courts in this Circuit similarly may consider whether a juvenile will appear at future hearings when deciding whether to order a juvenile detained until trial. *See* Conn. Gen. Stat. § 46b-133(c); N.Y. Fam. Ct. Act 320.5(3)(a)(i). Relying on such factors to determine citizenship would likely render the BIA's interpretation irrational. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011) ("[A]gency action must be based on non-arbitrary, *relevant* factors." (emphasis added) (internal quotation marks omitted)). Those concerns lend further support to our conclusion that Khalid's father's "physical custody" did not simply end on Khalid's arrest or the detention decision of a judge.

Finally, we note that we do not deal in this case with a juvenile adjudicated guilty and imprisoned pursuant to a court-ordered sentence at the time the juvenile claims to have acquired citizenship.

37

There may be reason in such situations to determine that a minor is not in a naturalizing parent's physical custody for purposes of 8 U.S.C. § 1431. *See Romo-Jimenez v. Lynch*, 607 F. App'x 745, 745–46 (9th Cir. 2015) (mem.) (concluding that a petitioner whose parent naturalized after that petitioner was adjudicated guilty of a state crime and imprisoned was not a U.S. citizen, because a juvenile court had committed the petitioner to the legal custody of the California Youth Authority). We need not address those circumstances as they were not present in this case.

Finally, we observe that the BIA's interpretation would produce unintended results. Although Khalid's case arises under his unique circumstances, the BIA's decision would likely produce unfortunate consequences for the citizenship of other LPR children facing different situations. For example, a high school boarding student away at school would not derive citizenship from her parent who naturalized unless she returned home before turning eighteen.

38

Similarly, a student on a semester trip abroad might be denied citizenship under the BIA's interpretation if his parent naturalized while he was abroad and he turned eighteen while on that trip. The BIA's interpretation likely forecloses derivative citizenship under those circumstances, without any inquiry into the particular circumstances of the parent's custody or the law governing the child's separation from the parent. We think that approach at odds with both the statute's language and context and decline to adopt it here. [9]

## CONCLUSION

We hold that the brief, temporary separation created by Khalid's pretrial juvenile detention did not prevent Khalid from satisfying the "physical custody" requirement of 8 U.S.C. § 1431(a), and that consequently, he obtained derivative citizenship from his

---

[9] We find our conclusion regarding Khalid's citizenship status sufficiently clear from the text of the INA, the statutory context, and the JDPA to decline to address Khalid's arguments regarding due process and equal protection. We express no view on those arguments.

39

father in 2011. As a result, Khalid is a citizen of the United States.

Accordingly, we **GRANT** the petition for review, **VACATE** the BIA's

decision, and **REMAND** with instructions to terminate Khalid's

removal proceedings

JACOBS, *Circuit Judge*, with whom Judge Hall joins, concurring:

I concur in the Opinion of the Court, its reasoning, and its result. At the same time, I cannot congratulate Khalid on his American citizenship. He plotted sneaking violence against Americans, who gave his family a home, and he cooperated with the authorities only when, having been caught, he found himself needing another kind of refuge.

Khalid derived citizenship from his citizen father. The premise for that derivative citizenship was that, during the crucial period between Khalid's father's naturalization and Khalid's eighteenth birthday, Khalid was in his father's physical custody-- notwithstanding that he was behind bars on terrorism charges, in the custody of the authorities. So I need to emphasize, consistent with the Opinion, that that result obtained only because the detention was pretrial, brief, and in a juvenile facility where, under federal law, Khalid's citizen father was allowed and encouraged to

exercise influence over his son. The holding of this case is surprising enough, and does not lend itself to expansion.